# RANKIN ET AL. *v.* McPHERSON

No. 85–2068.   Argued March 23, 1987–Decided June 24, 1987

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, BLACKMUN, POWELL, and STEVENS, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 392. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and WHITE and O'CONNOR, JJ., joined, *post*, p. 394.

*Billy E. Lee* argued the cause for petitioners. With him on the briefs was *Mike Driscoll.*

*Glen D. Nager* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Lauber*, and *Leonard Schaitman.*

*Lloyd N. Cutler* argued the cause for respondent. With him on the brief were *William R. Richardson, Jr., Bruce V. Griffiths, Alvin J. Bronstein*, and *David B. Goldstein.**

JUSTICE MARSHALL delivered the opinion of the Court.

The issue in this case is whether a clerical employee in a county Constable's office was properly discharged for re-

---

*\*David Crump, Wayne W. Schmidt*, and *James P. Manak* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging reversal.

*Robert H. Chanin* and *Jeremiah A. Collins* filed a brief for the National Education Association as *amicus curiae* urging affirmance.

marking, after hearing of an attempt on the life of the President, "If they go for him again, I hope they get him."

I

On January 12, 1981, respondent Ardith McPherson was appointed a deputy in the office of the Constable of Harris County, Texas. The Constable is an elected official who functions as a law enforcement officer.[1] At the time of her appointment, McPherson, a black woman, was 19 years old and had attended college for a year, studying secretarial science. Her appointment was conditional for a 90-day probationary period.

Although McPherson's title was "deputy constable," this was the case only because all employees of the Constable's office, regardless of job function, were deputy constables. Tr. of Oral Arg. 5. She was not a commissioned peace officer, did not wear a uniform, and was not authorized to make arrests or permitted to carry a gun.[2] McPherson's duties were purely clerical. Her work station was a desk at which there was no telephone, in a room to which the public did not have ready access. Her job was to type data from court pa-

---

[1] While the Constable's office is a law enforcement agency, Constable Rankin testified that other law enforcement departments were charged with the day-to-day enforcement of criminal laws in the county, Tr. (Jan. 21, 1985), pp. 11, 27 (hereinafter Tr.), and that more than 80% of the budget of his office was devoted to service of civil process, service of process in juvenile delinquency cases, and execution of mental health warrants. *Id.*, at 15–17. The involvement of his office in criminal cases, he testified, was in large part limited to warrants in bad check cases. *Id.*, at 24 ("Most of our percentage is with civil papers and hot check warrants").

[2] In order to serve as a commissioned peace officer, as the Court of Appeals noted, a deputy would have to undergo a background check, a psychological examination, and over 300 hours of training in law enforcement. 786 F. 2d 1233, 1237 (CA5 1986). Constable Rankin testified that while his office had on occasion been asked to guard various dignitaries visiting Houston, Tr. 24, a deputy who was not a commissioned peace officer would never be assigned to such duty, *id.*, at 30. Nor would such a deputy even be assigned to serve process. *Id.*, at 32.

pers into a computer that maintained an automated record of the status of civil process in the county. Her training consisted of two days of instruction in the operation of her computer terminal.

On March 30, 1981, McPherson and some fellow employees heard on an office radio that there had been an attempt to assassinate the President of the United States. Upon hearing that report, McPherson engaged a co-worker, Lawrence Jackson, who was apparently her boyfriend, in a brief conversation, which according to McPherson's uncontroverted testimony went as follows:

"Q: What did you say?

"A: I said I felt that that would happen sooner or later.

"Q: Okay. And what did Lawrence say?

"A: Lawrence said, yeah, agreeing with me.

"Q: Okay. Now, when you—after Lawrence spoke, then what was your next comment?

"A: Well, we were talking—it's a wonder why they did that. I felt like it would be a black person that did that, because I feel like most of my kind is on welfare and CETA, and they use medicaid, and at the time, I was thinking that's what it was.

". . . But then after I said that, and then Lawrence said, yeah, he's cutting back medicaid and food stamps. And I said, yeah, welfare and CETA. I said, shoot, if they go for him again, I hope they get him."[3]

McPherson's last remark was overheard by another Deputy Constable, who, unbeknownst to McPherson, was in the room at the time. The remark was reported to Constable Rankin,

---

[3] Tr. 73. In its first order in this case, the District Court found that McPherson's statement had been, " 'I hope if they go for him again, they get him.' " Civ. Action No. H–81–1442 (Apr. 15, 1983). In its second decision, the District Court made no explicit finding as to what was said. McPherson's testimony, as reproduced in the text, is only slightly different from the District Court's version, and the distinction is not significant.

who summoned McPherson. McPherson readily admitted that she had made the statement, but testified that she told Rankin, upon being asked if she made the statement, "Yes, but I didn't mean anything by it." App. 38.[4] After their discussion, Rankin fired McPherson.[5]

McPherson brought suit in the United States District Court for the Southern District of Texas under 42 U. S. C. § 1983, alleging that petitioner Rankin, in discharging her, had violated her constitutional rights under color of state law. She sought reinstatement, backpay, costs and fees, and other equitable relief. The District Court held a hearing, and then granted summary judgment to Constable Rankin, holding that McPherson's speech had been unprotected and that her discharge had therefore been proper. Civ. Action No. H-81-1442 (Apr. 15, 1983).[6] The Court of Appeals for the Fifth Circuit vacated and remanded for trial, 736 F. 2d 175 (1984), on the ground that substantial issues of material fact regarding the context in which the statement

---

[4] Rankin testified that, when he asked McPherson whether she meant the remark, she replied, "I sure do." App. 38. In neither of its opinions in this case did the District Court make an explicit finding regarding which version of this conflicting testimony it found credible. See also 736 F. 2d 175, 177, and n. 3 (CA5 1984).

We note that the question whether McPherson "meant" the statement is ambiguous. Assuming that McPherson told Rankin she "meant it," McPherson might think she had said that she "meant" that she disliked the President and would not mind if he were dead, while Rankin might believe that McPherson "meant" to indicate approval of, or in any event hope for, political assassination. This ambiguity makes evident the need for carefully conducted hearings and precise and complete findings of fact.

[5] McPherson evidently returned to the office the next day seeking an interview with the Constable, but Rankin refused to see her.

[6] Because the District Court entered summary judgment after the first hearing, we must conclude that it did not, in its April 15 ruling, resolve any disputed issues of material fact. We have considered the District Court's findings of fact made after this hearing only to the extent they address what appear to be undisputed factual issues.

had been made precluded the entry of summary judgment. *Id.*, at 180.

On remand, the District Court held another hearing and ruled once again, this time from the bench, that the statements were not protected speech. App. 120. Again, the Court of Appeals reversed. 786 F. 2d 1233 (1986). It held that McPherson's remark had addressed a matter of public concern, requiring that society's interest in McPherson's freedom of speech be weighed against her employer's interest in maintaining efficiency and discipline in the workplace. *Id.*, at 1236. Performing that balancing, the Court of Appeals concluded that the Government's interest did not outweigh the First Amendment interest in protecting McPherson's speech. Given the nature of McPherson's job and the fact that she was not a law enforcement officer, was not brought by virtue of her job into contact with the public, and did not have access to sensitive information, the Court of Appeals deemed her "duties . . . so utterly ministerial and her potential for undermining the office's mission so trivial" as to forbid her dismissal for expression of her political opinions. *Id.*, at 1239. "However ill-considered Ardith McPherson's opinion was," the Court of Appeals concluded, "it did not make her unfit" for the job she held in Constable Rankin's office. *Ibid.* The Court of Appeals remanded the case for determination of an appropriate remedy.

We granted certiorari, 479 U. S. 913 (1986), and now affirm.

## II

It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech. *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972). Even though McPherson was merely a probationary employee, and even if she could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to

freedom of expression. See *Mt. Healthy City Board of Education* v. *Doyle,* 429 U. S. 274, 284–285 (1977); *Perry* v. *Sindermann, supra,* at 597–598.

The determination whether a public employer has properly discharged an employee for engaging in speech requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering* v. *Board of Education,* 391 U. S. 563, 568 (1968); *Connick* v. *Myers,* 461 U. S. 138, 140 (1983). This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment. On the one hand, public employers are *employers,* concerned with the efficient function of their operations; review of every personnel decision made by a public employer could, in the long run, hamper the performance of public functions. On the other hand, "the threat of dismissal from public employment is . . . a potent means of inhibiting speech." *Pickering, supra,* at 574. Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.

## A

The threshold question in applying this balancing test is whether McPherson's speech may be "fairly characterized as constituting speech on a matter of public concern." *Connick,* 461 U. S., at 146.[7] "Whether an employee's speech

---

[7] Even where a public employee's speech does not touch upon a matter of public concern, that speech is not "totally beyond the protection of the First Amendment," *Connick* v. *Myers,* 461 U. S., at 147, but "absent the most unusual circumstances a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Ibid.*

addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.*, at 147–148. The District Court apparently found that McPherson's speech did not address a matter of public concern.[8] The Court of Appeals rejected this conclusion, finding that "the life and death of the President are obviously matters of public concern." 786 F. 2d, at 1236. Our view of these determinations of the courts

---

[8] The District Court, after its second hearing in this case, delivered its opinion from the bench and did not explicitly address the elements of the required balancing test. It did, however, state that the case was "not like the *Myers* case where Ms. Myers was trying to comment upon the internal affairs of the office, or matters upon public concern. I don't think it is a matter of public concern to approve even more to *[sic]* the second attempt at assassination." App. 119.

The dissent accuses us of distorting and beclouding the record, evidently because we have failed to accord adequate deference to the purported "findings" of the District Court. *Post*, at 396. We find the District Court's "findings" from the bench significantly more ambiguous than does the dissent:

"Then I suppose we get down to the serious question, what did she 'mean.' I don't believe she meant nothing, as she said here today, and I don't believe that those words were mere political hyperbole. They were something more than political hyperbole. They expressed such dislike of a high public government official as to be violent words, in context. This is not the situation where one makes an idle threat to kill someone for not picking them up on time, or not picking up their clothes. It was more than that.

"It's not like the *Myers* case where Ms. Myers was trying to comment upon the internal affairs of the office, or matters upon public concern. I don't think it is a matter of public concern to *[sic]* approve even more to the second attempt at assassination." App. 119.

The District Court's sole affirmative "finding" here, that McPherson's statement constituted "violent words, in context," is unintelligible in First Amendment terms. Even assuming that the District Court can be viewed to have made any findings of fact on the public concern issue, it is unclear to what extent that issue presents a question of fact at all. In addition, the dissent fails to acknowledge that any factual findings subsumed in the "public concern" determination are subject to constitutional fact review. See also 786 F. 2d, at 1237.

below is limited in this context by our constitutional obligation to assure that the record supports this conclusion: "'[W]e are compelled to examine for ourselves the statements in issue and the circumstances under which they [were] made to see whether or not they . . . are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.'" *Connick, supra,* at 150, n. 10, quoting *Pennekamp* v. *Florida,* 328 U. S. 331, 335 (1946) (footnote omitted).[9]

Considering the statement in context, as *Connick* requires, discloses that it plainly dealt with a matter of public concern. The statement was made in the course of a conversation addressing the policies of the President's administration.[10] It came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President.[11] While a statement

---

[9] See also *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U. S. 485, 499 (1984) ("[I]n cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression,'" quoting *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 284–286 (1964)). The ultimate issue—whether the speech is protected—is a question of law. *Connick, supra,* at 148, n. 7.

[10] McPherson actually made the statement at issue not once, but twice, and only in the first instance did she make the statement in the context of a discussion of the President's policies. McPherson repeated the statement to Constable Rankin at his request. We do not consider the second statement independently of the first, however. Having been required by the Constable to repeat her statement, McPherson might well have been deemed insubordinate had she refused. A public employer may not divorce a statement made by an employee from its context by requiring the employee to repeat the statement, and use that statement standing alone as the basis for a discharge. Such a tactic could in some cases merely give the employee the choice of being fired for failing to follow orders or for making a statement which, out of context, may not warrant the same level of First Amendment protection it merited when originally made.

[11] The private nature of the statement does not, contrary to the suggestion of the United States, Brief for United States as *Amicus Curiae* 18,

that amounted to a threat to kill the President would not be protected by the First Amendment, the District Court concluded, and we agree, that McPherson's statement did not amount to a threat punishable under 18 U. S. C. § 871(a) or 18 U. S. C. § 2385, or, indeed, that could properly be criminalized at all. See 786 F. 2d, at 1235 ("A state would . . . face considerable constitutional obstacles if it sought to criminalize the words that were uttered by McPherson on the day the President was shot"); see also Brief for United States as *Amicus Curiae* 8 ("[W]e do not think that respondent's remark could be criminalized"); cf. *Watts* v. *United States*, 394 U. S. 705 (1969) *(per curiam)*.[12] The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern. "[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964); see also *Bond* v. *Floyd*, 385 U. S. 116, 136 (1966): "Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected."

---

vitiate the status of the statement as addressing a matter of public concern. See *Givhan* v. *Western Line Consolidated School Dist.*, 439 U. S. 410, 414–416 (1979).

[12] Constable Rankin was evidently unsure of this; he testified that he called the Secret Service to report the incident and suggest that they investigate McPherson. Tr. 44. McPherson testified that the Secret Service did, in fact, come to her home:

"Oh, they told me that they thought it was a prank call, but . . . they have to investigate any call that they get.

.     .     .     .     .

". . . When they left, they told my mama and me that they were sorry. They said that they knew it was a prank call, they just have to come out and investigate. They said that's the procedure." *Id.*, at 81–82.

## B

Because McPherson's statement addressed a matter of public concern, *Pickering* next requires that we balance McPherson's interest in making her statement against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U. S., at 568.[13] The State bears a burden of justifying the discharge on legitimate grounds. *Connick*, 461 U. S., at 150.

In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose. See *id.*, at 152–153; *Givhan* v. *Western Line Consolidated School Dist.*, 439 U. S. 410, 415, n. 4 (1979). We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. *Pickering*, 391 U. S., at 570–573.

These considerations, and indeed the very nature of the balancing test, make apparent that the state interest element of the test focuses on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest. From this perspective, however, petitioners fail to demonstrate a state interest that outweighs McPherson's First Amendment rights. While

---

[13] We agree with JUSTICE POWELL that a purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee. *Post*, at 393. To the extent petitioners' claim that McPherson's speech rendered her an unsuitable employee for a law enforcement agency implicates a serious state interest and necessitates the application of the balancing element of the *Pickering* analysis, we proceed to that task.

McPherson's statement was made at the workplace, there is no evidence that it interfered with the efficient functioning of the office. The Constable was evidently not afraid that McPherson had disturbed or interrupted other employees — he did not inquire to whom respondent had made the remark and testified that he "was not concerned who she had made it to," Tr. 42. In fact, Constable Rankin testified that the possibility of interference with the functions of the ·Constable's office had *not* been a consideration in his discharge of respondent and that he did not even inquire whether the remark had disrupted the work of the office.[14]

Nor was there any danger that McPherson had discredited the office by making her statement in public. McPherson's speech took place in an area to which there was ordinarily no public access; her remark was evidently made in a private conversation with another employee. There is no suggestion that any member of the general public was present or heard McPherson's statement. Nor is there any evidence that employees other than Jackson who worked in the room even heard the remark. Not only was McPherson's discharge unrelated to the functioning of the office, it was not based on any assessment by the Constable that the remark demonstrated a character trait that made respondent unfit to perform her work.[15]

---

[14] He testified: "I did not base my action on whether the work was interrupted or not. I based my action on a statement that was made to me direct." Tr. 45.

[15] In response to a question from the bench, counsel at oral argument before this Court expressly denied that this was the motive for the Constable's discharge of McPherson:

"QUESTION: . . . [S]uppose when she was called in by the constable and asked whether she had said that, she said, 'Yes, I said it.'

"MR. LEE [counsel for petitioners]: She was, Your Honor. She was called in by the constable.

"QUESTION: I know. Now, suppose she had said, 'Yeah, I said it, but, you know, I didn't really mean anything by it.'

While the facts underlying Rankin's discharge of McPherson are, despite extensive proceedings in the District Court, still somewhat unclear,[16] it is undisputed that he fired McPherson based on the *content* of her speech. Evidently because McPherson had made the statement, and because the Constable believed that she "meant it," he decided that she was not a suitable employee to have in a law enforcement agency. But in weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where, as here, an employee serves no confidential, policymaking, or public

"MR. LEE: Yes, sir.

"QUESTION: Do we know whether she would have been fired? I mean, conceivably you might fire her anyway. I mean, he might have said, 'Well, you know, you shouldn't talk like that, whether you mean it or not. I don't want that kind of talk in my law enforcement agency, whether you mean it or not. It shows poor judgment, and you're fired.'

"Was that the basis for his dismissal?

"MR. LEE: Your Honor, I would say not, based upon two trials that we have been through in the District Court." Tr. of Oral Arg. 10–11.

[16] Rankin's assertion, as evidently credited by the District Court after its first hearing, was that he discharged respondent because her statement undermined his "confidence" in her. App. 42–43. After its second hearing, the District Court did not state clearly what it concluded the motive for respondent's discharge to be. Petitioners' counsel, at oral argument, suggested that McPherson was discharged because she hoped that the President would be assassinated. Tr. of Oral Arg. 11–13. The Court of Appeals similarly classified the District Court's finding. See 786 F. 2d, at 1237 ("For the purpose of applying the *Pickering/Connick* balancing test, we accept the district court's conclusion that McPherson actually hoped that the President would be assassinated"). We are not persuaded that the Court of Appeals has properly divined the meaning of the District Court's findings, but, even accepting the Court of Appeals' view, we agree with the Court of Appeals that the speech was protected.

contact role, the danger to the agency's successful function-
ing from that employee's private speech is minimal. We
cannot believe that every employee in Constable Rankin's of-
fice, whether computer operator, electrician, or file clerk, is
equally required, on pain of discharge, to avoid any state-
ment susceptible of being interpreted by the Constable as an
indication that the employee may be unworthy of employ-
ment in his law enforcement agency.[17]   At some point, such
concerns are so removed from the effective functioning of the
public employer that they cannot prevail over the free speech
rights of the public employee.[18]

---

[17] We therefore reject the notion, expressed by petitioners' counsel
at oral argument, that the fact that an employee was deputized meant,
regardless of that employee's job responsibility, that the Constable could
discharge the employee for any expression inconsistent with the goals of a
law enforcement agency.

"MR. LEE [counsel for petitioners]: The man who sweeps the floor in
the constable's office is not employed by the constable.   He's employed by
commissioners' court who takes care of all of the courthouses."   Tr. of Oral
Arg. 6.

"QUESTION: I guess it's a lucky thing then that the constable is not
himself responsible for keeping the courthouse clean, which could have
been the case.   I mean, you—

"MR. LEE: Which could have been the case, yes, sir.   That is right,
because he would then—

"QUESTION: Then your argument would indeed extend to the man
who swept the floor; right?

.                 .                 .                 .                 .

"QUESTION: And you would be making the same argument here—
"MR. LEE: Yes, sir.
"QUESTION:  —because that man had the name of deputy?
"MR. LEE: That's right."   Id., at 8.

[18] This is not to say that clerical employees are insulated from discharge
where their speech, taking the acknowledged factors into account, truly
injures the public interest in the effective functioning of the public em-
ployer.   Cf. McMullen v. Carson, 754 F. 2d 936 (CA11 1985) (clerical em-
ployee in sheriff's office properly discharged for stating on television news
that he was an employee for the sheriff's office and a recruiter for the Ku
Klux Klan).

This is such a case. McPherson's employment-related interaction with the Constable was apparently negligible. Her duties were purely clerical and were limited solely to the civil process function of the Constable's office. There is no indication that she would ever be in a position to further—or indeed to have any involvement with—the minimal law enforcement activity engaged in by the Constable's office. Given the function of the agency, McPherson's position in the office, and the nature of her statement, we are not persuaded that Rankin's interest in discharging her outweighed her rights under the First Amendment.

Because we agree with the Court of Appeals that McPherson's discharge was improper, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE POWELL, concurring.

It is not easy to understand how this case has assumed constitutional dimensions and reached the Supreme Court of the United States. The fact that the case is here, however, illustrates the uniqueness of our Constitution and our system of judicial review: courts at all levels are available and receptive to claims of injustice, large and small, by any and every citizen of this country.

As the Court notes, at the time this dispute arose respondent McPherson was a 19-year-old probationary employee in the Constable's office in Harris County, Texas. Her only job was to type information from court papers into a computer. She had no law enforcement responsibility, nor was she permitted to perform the primary task of the Constable's office, serving civil process. While she was seated at her desk, the office radio announced the shocking news that someone had tried to assassinate the President. Reacting to the report, McPherson engaged in a brief conversation with her coworker, at the end of which she said: "[I]f they go for him again, I hope they get him." Tr. (Jan. 21, 1985), p. 73. This unfortunate remark was overheard by another

employee, who relayed it to the Constable. McPherson immediately was summoned to the Constable's office, where she freely admitted having made the statement. Based on this single comment, McPherson was summarily discharged.

There is no dispute that McPherson's comment was made during a private conversation with a co-worker who happened also to be her boyfriend. She had no intention or expectation that it would be overheard or acted on by others. Given this, I think it is unnecessary to engage in the extensive analysis normally required by *Connick* v. *Myers*, 461 U. S. 138 (1983), and *Pickering* v. *Board of Education*, 391 U. S. 563 (1968). If a statement is on a matter of public concern, as it was here, it will be an unusual case where the employer's legitimate interests will be so great as to justify punishing an employee for this type of private speech that routinely takes place at all levels in the workplace. The risk that a single, offhand comment directed to only one other worker will lower morale, disrupt the work force, or otherwise undermine the mission of the office borders on the fanciful.\* To the extent that the full constitutional analysis of the competing interests is required, I generally agree with the Court's opinion.

_____

\*I recognize, and strongly agree, that a public employer, no less than his private-sector counterpart, must have authority to maintain the efficiency as well as the integrity of his office. As the Court notes, "'the State, as an employer, [has an interest] in promoting the efficiency of the public services it performs through its employees.'" *Ante*, at 384 (quoting *Pickering* v. *Board of Education*, 391 U. S. 563, 568 (1968), and *Connick* v. *Myers*, 461 U. S. 138, 140 (1983)). I do not read the Court's opinion as extending the *Connick/Pickering* test, or otherwise making it more difficult for employers to discipline workers whose speech interferes with these goals. Cf. *Arnett* v. *Kennedy*, 416 U. S. 134, 168 (1974) (POWELL, J., concurring in part and concurring in result in part) ("[T]he Government's interest in being able to act expeditiously to remove an unsatisfactory employee is substantial") (footnote omitted). In this case, however, there is no objective evidence that McPherson's lone comment had any negative effect on the morale or efficiency of the Constable's office. See *ante*, at 388–389.

In my view, however, the case is hardly as complex as might be expected in a dispute that now has been considered five separate times by three different federal courts. The undisputed evidence shows that McPherson made an ill-considered—but protected—comment during a private conversation, and the Constable made an instinctive, but intemperate, employment decision on the basis of this speech. I agree that on these facts, McPherson's private speech is protected by the First Amendment.

I join the opinion of the Court.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join, dissenting.

I agree with the proposition, felicitously put by Constable Rankin's counsel, that no law enforcement agency is required by the First Amendment to permit one of its employees to "ride with the cops and cheer for the robbers." App. 94. The issue in this case is whether Constable Rankin, a law enforcement official, is prohibited by the First Amendment from preventing his employees from saying of the attempted assassination of President Reagan—on the job and within hearing of other employees—"If they go for him again, I hope they get him." The Court, applying the two-prong analysis of *Connick* v. *Myers*, 461 U. S. 138 (1983), holds that McPherson's statement was protected by the First Amendment because (1) it "addressed a matter of public concern," and (2) McPherson's interest in making the statement outweighs Rankin's interest in suppressing it. In so doing, the Court significantly and irrationally expands the definition of "public concern"; it also carves out a new and very large class of employees—*i. e.*, those in "nonpolicymaking" positions—who, if today's decision is to be believed, can never be disciplined for statements that fall within the Court's expanded definition. Because I believe the Court's conclusions rest upon a distortion of both the record and the Court's prior decisions, I dissent.

## I

To appreciate fully why the majority errs in reaching its first conclusion, it is necessary to recall the origins and purposes of *Connick*'s "public concern" requirement. The Court long ago rejected Justice Holmes' approach to the free speech rights of public employees, that "[a policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman," *McAuliffe* v. *Mayor of New Bedford*, 155 Mass. 216, 220, 29 N. E. 517 (1892). We have, however, recognized that the government's power as an employer to make hiring and firing decisions on the basis of what its employees and prospective employees say has a much greater scope than its power to regulate expression by the general public. See, *e. g.*, *Pickering* v. *Board of Education*, 391 U. S. 563, 568 (1968).

Specifically, we have held that the First Amendment's protection against adverse personnel decisions extends only to speech on matters of "public concern," *Connick, supra*, at 147–149, which we have variously described as those matters dealing in some way with "the essence of self-government," *Garrison* v. *Louisiana*, 379 U. S. 64, 74–75 (1964), matters as to which "free and open debate is vital to informed decisionmaking by the electorate," *Pickering, supra*, at 571–572, and matters as to which "'debate . . . [must] be uninhibited, robust, and wide-open,'" *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749, 755 (1985) (plurality opinion) (quoting *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964)). In short, speech on matters of public concern is that speech which lies "at the heart of the First Amendment's protection," *First Nat. Bank* v. *Bellotti*, 435 U. S. 765, 776 (1978). If, but only if, an employee's speech falls within this category, a public employer seeking to abridge or punish it must show that the employee's interest is outweighed by the government's interest, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering, supra*, at 568.

McPherson fails this threshold requirement. The statement for which she was fired—and the only statement reported to the Constable—was, "If they go for him again, I hope they get him." It is important to bear in mind the District Judge's finding that this was *not* hyperbole. The Court's opinion not only does not clarify that point, but beclouds it by a footnote observing that the District Judge did not explicitly resolve the conflict in testimony as to whether McPherson told the Constable that she "meant" what she had said. *Ante,* at 382, n. 4. He did not. But he assuredly found that, whether McPherson later said she meant it or not, and whether she even meant it at the time or not, the idea she expressed was not just an exaggerated expression of her disapproval for the President's policies, but a voicing of the hope that, next time, the President would be killed. The District Judge rejected McPherson's argument that her statement was "mere political hyperbole," finding, to the contrary, that it was, "in context," "violent words." 786 F. 2d 1233, 1235 (CA5 1986). "This is not," he said, "the situation where one makes an idle threat to kill someone for not picking them *[sic]* up on time, or not picking up their *[sic]* clothes. It was more than that." *Ibid.* He ruled against McPherson at the conclusion of the second hearing because "I don't think it is a matter of public concern to approve even more to *[sic]* the second attempt at assassination." App. 119. The Court's opinion does not attempt to set aside this finding as to the import of the statement, and there is indeed no basis for doing so, since it is entirely reasonable and supported by the evidence.

Given the meaning of the remark, there is no basis for the Court's suggestion, *ante,* at 386–387, that McPherson's criticisms of the President's policies that immediately preceded the remark can illuminate it in such fashion as to render it constitutionally protected. Those criticisms merely reveal the speaker's *motive* for expressing the desire that the next attempt on the President's life succeed, in the same way that

a political assassin's remarks to his victim before pulling the trigger might reveal a motive for that crime. The majority's magical transformation of the *motive* for McPherson's statement into its *content* is as misguided as viewing a political assassination preceded by a harangue as nothing more than a strong denunciation of the victim's political views.

That McPherson's statement does not constitute speech on a matter of "public concern" is demonstrated by comparing it with statements that have been found to fit that description in prior decisions involving public employees. McPherson's statement is a far cry from the question by the Assistant District Attorney in *Connick* whether her co-workers "ever [felt] pressured to work in political campaigns," *Connick*, 461 U. S., at 149; from the letter written by the public school teacher in *Pickering* criticizing the Board of Education's proposals for financing school construction, *Pickering, supra*, at 566; from the legislative testimony of a state college teacher in *Perry* v. *Sindermann*, 408 U. S. 593, 595 (1972), advocating that a particular college be elevated to 4-year status; from the memorandum given by a teacher to a radio station in *Mt. Healthy City Board of Ed.* v. *Doyle*, 429 U. S. 274, 282 (1977), dealing with teacher dress and appearance; and from the complaints about school board policies and practices at issue in *Givhan* v. *Western Line Consolidated School Dist.*, 439 U. S. 410, 413 (1979). See *Connick, supra*, at 145–146.

McPherson's statement is indeed so different from those that it is only one step removed from statements that we have previously held entitled to no First Amendment protection even in the nonemployment context—including assassination threats against the President (which are illegal under 18 U. S. C. § 871), see *Frohwerk* v. *United States*, 249 U. S. 204, 206 (1919); "'fighting' words," *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572 (1942); epithets or personal abuse, *Cantwell* v. *Connecticut*, 310 U. S. 296, 309–310 (1940); and advocacy of force or violence, *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 591–592 (1952). A statement

lying so near the category of completely unprotected speech cannot fairly be viewed as lying within the "heart" of the First Amendment's protection; it lies within that category of speech that can neither be characterized as speech on matters of public concern nor properly subject to criminal penalties, see *Connick, supra,* at 147. Once McPherson stopped explicitly criticizing the President's policies and expressed a desire that he be assassinated, she crossed the line.

The Court reaches the opposite conclusion only by distorting the concept of "public concern." It does not *explain* how a statement expressing approval of a serious and violent crime—assassination of the President—can possibly fall within that category. It simply rehearses the "context" of McPherson's statement, which as we have already seen is irrelevant here, and then concludes that because of that context, and because the statement "came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President," the statement "plainly dealt with a matter of public concern." *Ante,* at 386. I cannot respond to this progression of reasoning except to say I do not understand it. Surely the Court does not mean to adopt the reasoning of the court below, which was that McPherson's statement was "addressed to a matter of public concern" within the meaning of *Connick* because the public would obviously be "concerned" about the assassination of the President. That is obviously untenable: The public would be "concerned" about a statement threatening to blow up the local federal building or demanding a $1 million extortion payment, yet that kind of "public concern" does not entitle such a statement to any First Amendment protection at all.

## II

Even if I agreed that McPherson's statement was speech on a matter of "public concern," I would still find it unprotected. It is important to be clear on what the issue is in this part of the case. It is not, as the Court suggests,

whether "Rankin's interest *in discharging [McPherson]* out-weighed her rights under the First Amendment." *Ante*, at 392 (emphasis added). Rather, it is whether his interest *in preventing the expression of such statements in his agency* outweighed her First Amendment interest in making the statement. We are not deliberating, in other words, (or at least should not be) about whether the sanction of dismissal was, as the concurrence puts it, "an . . . intemperat[e] employment decision." It may well have been—and personally I think it was. But we are not sitting as a panel to develop sound principles of proportionality for adverse actions in the state civil service. We are asked to determine whether, given the interests of this law enforcement office, McPherson had a *right* to say what she did—so that she could not only not be fired for it, but could not be formally reprimanded for it, or even prevented from repeating it endlessly into the future. It boggles the mind to think that she has such a right.

The Constable testified that he "was very concerned that this remark was made." App. 81. Rightly so. As a law enforcement officer, the Constable obviously has a strong interest in preventing statements by any of his employees approving, or expressing a desire for, serious, violent crimes—regardless of whether the statements actually interfere with office operations at the time they are made or demonstrate character traits that make the speaker unsuitable for law enforcement work. In *Connick*, we upheld the dismissal of an Assistant District Attorney for circulating among her co-workers a questionnaire implicitly criticizing her superiors. Although we held that one of the questions—dealing with pressure in the office to participate in political campaigns—satisfied the "public concern" requirement, we held that the discharge nonetheless did not violate the First Amendment because the questionnaire itself "carrie[d] the clear potential for undermining office relations." *Connick, supra,* at 152. Statements like McPherson's obviously carry a similar potential in an office devoted to law enforcement. Although that

proposition is in my view evident on its face, we have actual evidence of it in the present record: The only reason McPherson's remark was brought to the Constable's attention was that one of his deputies, Captain Levrier, had overheard the remark and, according to the Constable, "was very upset because of [it]." App. 80.*

Statements by the Constable's employees to the effect that "if they go for the President again, I hope they get him" might also, to put it mildly, undermine public confidence in the Constable's office. A public employer has a strong interest in preserving its reputation with the public. See, e. g., *Snepp* v. *United States*, 444 U. S. 507, 509, n. 3 (1980); *CSC* v. *Letter Carriers*, 413 U. S. 548, 564–565 (1973). We know—from undisputed testimony—that McPherson had or might have had some occasion to deal with the public while carrying out her duties. See App. 73 (answering telephone inquiries); *id.*, at 78–79 (personal assistance).

The Court's sweeping assertion (and apparent holding) that where an employee "serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal," *ante*, at 390–391, is simply contrary to reason and experience. Nonpolicymaking employees (the Assistant District Attorney in *Connick*, for example) can hurt working relationships and undermine public confidence in an organization every bit as much as policymaking employees. I, for one, do not look forward to the new First Amendment world the Court creates, in which nonpolicymaking employees of the Equal Employment Opportunity Commission must

---

*The majority errs in asserting that "Constable Rankin testified that the possibility of interference with the functions of the Constable's office had *not* been a consideration in his discharge of respondent." *Ante*, at 389. In fact, the statement on which the majority relies for that proposition merely affirms that the Constable did not base his decision "'on whether the work was interrupted or not.'" See *ante*, at 389, n. 14, quoting Tr. (Jan. 21, 1985), p. 45. That says nothing about his perceptions of the effect of such statements upon office morale and efficiency.

be permitted to make remarks on the job approving of racial discrimination, nonpolicymaking employees of the Selective Service System to advocate noncompliance with the draft laws, and (since it is really quite difficult to contemplate anything more absurd than the present case itself), non-policymaking constable's deputies to express approval for the assassination of the President.

In sum, since Constable Rankin's interest in maintaining both an esprit de corps and a public image consistent with his office's law enforcement duties outweighs any interest his employees may have in expressing on the job a desire that the President be killed, even assuming that such an expression addresses a matter of public concern it is not protected by the First Amendment from suppression. I emphasize once again that that is the issue here—and *not*, as both the Court's opinion and especially the concurrence seem to assume, whether the means used to effect suppression (viz., firing) were excessive. The First Amendment contains no "narrow tailoring" requirement that speech the government is entitled to suppress must be suppressed by the mildest means possible. If Constable Rankin was entitled (as I think any reasonable person would say he was) to admonish McPherson for saying what she did on the job, within hearing of her co-workers, and to warn her that if she did it again a formal censure would be placed in her personnel file, then it follows that he is entitled to rule that particular speech out of bounds in that particular work environment—and that is the end of the First Amendment analysis. The "intemperate" manner of the permissible suppression is an issue for another forum, or at least for a more plausibly relevant provision of the Constitution.

Because the statement at issue here did not address a matter of public concern, and because, even if it did, a law enforcement agency has adequate reason not to permit such expression, I would reverse the judgment of the court below.