Harry T. EDMUNDSON

v.

**BOROUGH OF KENNETT SQUARE, Robert F. Goddu, Kenneth Roberts, Herbert L. Waltz, and Albert J. McCarthy.**

Civ. A. No. 91–2618.

United States District Court, E.D. Pennsylvania.

March 31, 1995.

Jeffrey Pettit, Philadelphia, PA, for plaintiff.

Robert G. Hanna, Christine M. Brenner, Philadelphia, PA, for defendants.

## OPINION

DITTER, District Judge.

Plaintiff brings suit under 42 U.S.C. § 1983. He alleges that his discharge from governmental employment was wrongfully based on conduct protected by the First and Fourteenth Amendments.[1] The plaintiff and defendants have each moved for summary judgment. For the reasons discussed below, I will refuse plaintiff's motion and grant defendants' motion in part.

### I. STATEMENT OF FACTS

Plaintiff, Harry T. Edmundson, was a police officer in the Borough of Kennett Square. In July 1989, a police lieutenant directed him to make changes in a report. Edmundson refused. In August of 1989, the chief of police ordered him to accompany an inebriated person to the hospital. Edmundson disobeyed the order.

After these two incidents, the chief of police, Albert McCarthy, notified Edmundson that he soon would be dismissed. On September 12, 1989, the mayor of Kennett Square, the president of the borough council, and a member of the council confronted Edmundson with the charges against him, gave him an opportunity to respond, and ultimately offered him the choice of resigning or being dismissed.[2] Edmundson refused to resign.

On October 2, 1989, the borough council, acting on the mayor's recommendation, discharged Edmundson. In a letter dated the

---

1. Plaintiff also challenges the constitutionality of certain police regulations discussed below. I find, however, that because plaintiff is no longer a police officer, he lacks standing to challenge these regulations.

2. These officials, together with the borough, are the defendants in this case.

following day, the council explained that it based Edmundson's termination on the two incidents in the summer of 1989 described above, his prior "failure to follow proper directives, orders, and procedures of the police department as set forth in various discrepancy reports," and "repeated violations of departmental rules and regulations."

### A. Statements Explicitly Relied Upon

The reference to Edmundson's past history in the council's discharge letter requires elaboration. Edmundson had been disciplined in July of 1989 for violating Directive MCC–11 and Article 1 of the Kennett Square Police Department Manual.[3] The July 1989 discipline arose out of an incident in December of 1988. At that time, Edmundson was accused of breaking into the police chief's office. Based on this charge, he was suspended for one day. On March 1, 1989, and June 28, 1989, the *Chester County Press* published statements Edmundson made to his attorney concerning his suspension. These statements included:

> I was accused of [breaking into the police chief's office] at 11:00 pm at night, given a letter that I was going to be suspended and suspended that same night. So we have Judge, Jury, and Execution all in one shot.
> Out of all the amendments to the Constitution, I feel that he [the police chief] has at least bent most of them and just totally ignored the rest of them.

3. Directive MCC–11 provides:
   Officers shall not publicly criticize or ridicule the Department, its policies, or other officers by speech, writing, or other expression, where such speech, writing or other expression is defamatory, obscene, unlawful, undermines the effectiveness of the Department, interferes with the maintenance of discipline, or is made with reckless disregard for the truth.
   Article 1 of the department manual lists "publicly criticizing the official action of a superior official or Borough official" as "conduct unbecoming an officer."

4. Edmundson appealed this suspension to the borough's civil service commission. The commission held a hearing on September 5, 1989, and affirmed the suspension on September 28, 1989.

5. Edmundson's comments about the police chief were not central to the council's decision to

As a result of these statements, the borough council found that Edmundson violated Directive MCC–11 and Article 1 of the police department manual and suspended him for an additional three days.[4] This latter suspension was part of Edmundson's past history to which the council referred in the October 3, 1989, discharge letter and, therefore, the statements to the *Chester County Press* were part of the background considerations leading to the decision to dismiss Edmundson. Edmundson argues that to the extent that his dismissal was based on these statements, his First Amendment rights were violated because his comments related to a matter of public concern, and in balance, his right to free speech outweighed the government's right to the efficient administration of the police department. Despite the attenuated link between Edmundson's statements and his dismissal, I will assume for the purposes of this opinion that the causal connection exists.[5]

### B. Statements Possibly Relied Upon

In a somewhat different vein, Edmundson argues that his discharge was also improperly based in part on numerous other criticisms and complaints that he had voiced about the police administration. These complaints are different from those published in the *Chester County Press* because there is even less evidence linking them to the council's termination decision.[6] I will refer to this second

discharge. Indeed, the most that can be said is that *the entry* in Edmundson's personnel record resulting from his comments was considered. Additionally, although he appealed his dismissal to the borough's civil service commission, and also appealed related issues through proceedings before both a Pennsylvania Unemployment Compensation Referee and the Pennsylvania Unemployment Board of Review, before the filing of the instant complaint, Edmundson has *never contended* that his discharge was related to the exercise of his First Amendment rights.

6. Unlike the comments reported in the *Chester County Press*, the other criticisms voiced by Edmundson never led to official disciplinary action. Thus, as the record presently stands, there is even less reason to believe these other criticisms were considered as such in the decision to discharge.

type of statements collectively as "the statements possibly relied upon." There are four categories of these statements.

The first category of statements possibly relied upon by the borough in its decision to discharge Edmundson involved his criticism of McCarthy's actions as the president of the Kennett Square police association. These criticisms were made verbally, and were also contained in four documents: 1) a 1987 petition to McCarthy; 2) a June 1987 letter of resignation from the police association to Chief McCarthy, Mayor Robert F. Goddu, and the borough manager (who is not a defendant); 3) a December 1987 letter to Chief McCarthy, Mayor Goddu, and the borough manager; and, 4) the unfair labor practices charge filed with the Commonwealth of Pennsylvania on February 6, 1989, and served on Chief McCarthy, Mayor Goddu, Councilman Kenneth Roberts, and Councilman Herbert L. Waltz.

Specifically, Edmundson's 1987 petition demanded that the association elect its officers by secret ballot and that there be an accounting of association funds. In the other documents, Edmundson complained that association dues were being automatically deducted from the members' payroll without individual authorization, McCarthy had attempted to implement a quorum equalling fifty percent of members of the police association, and the police association did not file registration and tax statements with federal authorities.

The second category of statements possibly relied upon in the decision to discharge Edmundson involved his complaints about how the collective bargaining agreement was negotiated by Chief McCarthy and Lieutenant Zunnino on behalf of the police association in 1987.[7] Edmundson expressed dissatisfaction with the restructuring of the officer classification system that made McCarthy and Zunnino the only "Grade I" officers on the force. Edmundson also was disturbed that after they were promoted and in his mind became part of borough "management,"

McCarthy and Zunnino were present for a police association discussion of the collective bargaining agreement. Edmundson spoke about these concerns to Chief McCarthy and Mayor Goddu. He also included these complaints in his December 1987 letter, his unfair labor practice charge, and a grievance sent to the borough council and Chief McCarthy in December of 1988.

The third category of statements possibly relied upon in the decision to discharge Edmundson concerned his complaints about McCarthy's construction company being awarded a borough contract for the construction of a squad room. Edmundson maintained that although the initial cost estimate was $4,000, a sum that did not require competitive bidding, the actual cost of the contract exceeded $14,000 and, therefore, the contract should have been awarded on the basis of bids. Also, Edmundson asserted that McCarthy often worked on the construction during his night shifts. Edmundson brought these matters to the attention of the borough manager and also confronted McCarthy directly.

The final category of statements possibly relied upon in the decision to terminate Edmundson involve complaints by Edmundson to the mayor and the borough manager that full-time officers were in effect subcontracting their shifts out to part-time officers and pocketing the difference between the full-time and part-time salaries.

## II. APPLICABLE LAW

Although there is no general test to assess whether a public employee's speech is constitutionally protected, there is a uniform approach to these cases. See, e.g., Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Connick v. Myers, 461 U.S. 138, 154, 103 S.Ct. 1684, 1693–94, 75 L.Ed.2d 708 (1983). The court[8] must first determine whether a plaintiff alleging retaliatory discharge from government employment has established that his conduct

---

7. McCarthy was appointed chief of police and Zunnino was appointed lieutenant on February 24, 1988.

8. The question of whether speech is protected is a question of law to be answered by the court. Versarge v. Township of Clinton, 984 F.2d 1359, 1364 (3d Cir.1993) (citing Johnson v. Lincoln Univ., 776 F.2d 443, 453 (3d Cir.1985)).

is protected under the First Amendment. *San Filippo v. Bongiovanni,* 30 F.3d 424, 434 (3d Cir.1994). If the public employee contends that he was discharged in retaliation for his speech (as opposed, for example, to his religious views), he must show that the speech dealt with a matter of public concern.[9] If the speech is of public concern, the court must then balance the government's interest in the effective and efficient fulfillment of its responsibilities against the employee's First Amendment right. *Connick,* 461 U.S. at 151, 103 S.Ct. at 1692.

■■■ In assessing whether particular speech involves a matter of public concern, the court should examine the content, form, and context of the statements. *Id.* at 147–48, 103 S.Ct. at 1690–91. The inappropriate or controversial character of a statement is irrelevant to the question of whether it deals with a matter of public concern. *Rankin v. McPherson,* 483 U.S. 378, 387, 107 S.Ct. 2891, 2898–99, 97 L.Ed.2d 315 (1987). The speaker's motivation is significant insofar as speech by a public employee, relating to his employment, is deemed to be of public concern, except when that speech merely deals with personal information. *Swineford v. Snyder County,* 15 F.3d 1258, 1271 (3d Cir. 1994).

■■■ The Third Circuit has declined to define precisely "a matter of public concern." *See* Howard Kleinhendler, Note, *Protected Speech Under the First Amendment,* 66 Temp.L.Rev. 1075 (1993) (analyzing Third Circuit public employee speech decisions). It has, however, considered the "public concern" threshold inquiry in a variety of settings.[10] Analysis of these decisions reveals that speech about the way a government office is serving the public or discharging its

responsibilities is of public concern. *See, e.g., Sanguigni v. Pittsburgh Bd. of Pub. Ed.,* 968 F.2d 393, 397–99 (3d Cir.1992).

■■■ If the speech is related to matters of public concern, the court must then balance the government's interest in efficient public service against the speaker's First Amendment right. *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899. In conducting this balance, the court should consider the manner, time, and place of the employee's expression. *Id.* Other significant factors include whether the speech impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, impedes the performance of the speaker's duties, and interferes with the regular operation of the enterprise. *Id.*

### III. DISCUSSION

With this background in mind, I first consider the statements attributed to plaintiff and published in the *Chester County Press.* The paper reported that plaintiff said:

> I was accused of [breaking into the police chief's office] at 11:00 pm at night, given a letter that I was going to be suspended and suspended that same night. So we have Judge, Jury, and Execution all in one shot.

> Out of all the amendments to the Constitution, I feel that he [the police chief] has at least bent most of them and just totally ignored the rest of them.

Plaintiff maintained at a hearing before the Kennett Square Civil Service Commission that these statements were not intended to be made public, and were instead part of a private conversation with his attorney that

---

**9.** If a public employee is discharged for speech unrelated to a matter of public concern, it is unnecessary for the court to scrutinize the discharge. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689–90. Even though the discharge may appear unfair, it rarely raises constitutional issues—"the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Id.* at 149, 103 S.Ct. at 1691.

**10.** *Czurlanis v. Albanese* held that speech critical of the Division of Motor Vehicles was of public

concern because the comments were motivated by a desire to spotlight potential governmental wrongdoing. 721 F.2d 98, 100 (3d Cir.1983). *Zamboni v. Stamler* held that public employee criticism of an administrative body is a matter of public concern. 847 F.2d 73, 75 (3d Cir), *cert. denied,* 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988). *O'Donnell v. Yanchulis* held that speech alleging corrupt practices by government officials was of the utmost public concern. 875 F.2d 1059, 1062 (3d Cir.1989).

was overheard by the press. In his complaint, plaintiff again asserted that he did not intend to make the "amendment" comment public.

■ The threshold inquiry is whether these comments touch upon matters of public concern. Examining the content, form, and context of the comments in light of the purposes underlying free speech, I find that they do not involve matters of public concern.

The substantive content is minimal. The first comment, regarding "judge, jury, and execution," addresses a matter of internal police procedure not connected with any official misfeasance. Within the confines of due process, how the Kennett Square police department disciplines its police officers is its own business. Internal office procedures that do not evidence any official wrongdoing have consistently been held not to be a matter of public concern. *See, e.g., Connick,* 461 U.S. at 146–147, 103 S.Ct. at 1689–90. Moreover, the second comment—regarding the police chief's disregard for the Constitution—is nothing more than a vague pot-shot. The statement does not inject specific information into the market-place of ideas. Rather, it is a conclusory attack that fails to touch upon a matter of public concern as would a specific accusation of improper conduct—e.g., on a specific date, the chief of police broke the Fourth Amendment by circumventing the warrant process; in a specific case, the chief of police ignored individual due process rights.

The form and context of the statements further support the conclusion that they do not involve matters of public concern. Plaintiff himself has asserted on at least two occasions that he did not intend the comments to be public. He affirms these were not the statements of a police officer who had come forward to unearth official misconduct. From the context, it is plain that these were instead the private remarks of a disgruntled employee complaining to his lawyer about being disciplined. *See id.* at 148, 103 S.Ct. at 1691 ("Nor did Myers' seek to bring to light actual or potential wrongdoing or breach of public trust ..."). Because the statements reported in the *Chester County Press* were not intended by plaintiff to be made public

and do not concern the public, they do not afford plaintiff protection from discharge.

I next consider the statements the borough possibly relied upon in the decision to discharge Edmundson. The first step is to determine whether these statements touched upon matters of public concern. If they did not, so ends my inquiry. If any of the statements, however, were matters of public concern, I must balance the government's interest in efficient operation against the First Amendment interest. If this balance is struck in favor of plaintiff, the statement is "protected." Summary judgment with respect to these protected statements cannot be granted because a genuine issue of material fact remains about whether the statements were relied upon in the decision to fire plaintiff. By contrast, if none of the statements were matters of public concern, or if in balance, those statements that are matters of public concern are outweighed by the government's interest in efficient operation, summary judgment may be properly granted in favor of defendants.

■ The first category of statements possibly relied upon in the decision to terminate plaintiff involved criticisms of McCarthy's actions as the president of the Kennett Square police association. Considering the content, form, and context of these statements in light of the policies underlying free speech, I find that the comments are not matters of public concern.

The criticisms of McCarthy's action as the police association president involve matters of internal procedure not connected with official misconduct. Plaintiff complained that the association should hold elections for officer positions, have secret ballots for these elections, account for funds, and, not automatically deduct dues from the police payroll. Benign matters of internal procedure are rarely of public concern. *Sanguigni,* 968 F.2d at 399 (finding speech related solely to mundane employment grievances not public concern). Each of these criticisms involved the mechanics of how the police association, a private organization, conducts its affairs. Although comments by plaintiff relating to these procedures are clearly interesting to members of the police association, they are

not matters of public concern. The comments do not cast light on some official misconduct of which the electorate ought to be apprised. Since they do not touch upon a matter of public concern, the comments fail the threshold inquiry and cannot be the basis for plaintiff's suit.

■ The second category of statements possibly relied upon in the decision to terminate Edmundson involved his criticisms of the way in which McCarthy and Zunnino negotiated the collective bargaining agreement on behalf of the police association in 1987. Plaintiff complained about how the ranking system was restructured and other details of the agreement. As with the criticisms regarding the police association's internal procedures, the comments about the collective bargaining agreement do not touch upon matters of public concern. Plaintiff's comments did not meaningfully alter the balance of information available to voters enabling them to make more intelligent choices. Rather, plaintiff aired some unilluminating personal gripes. *See Swineford,* 15 F.3d at 1271.

■ The third and fourth categories of statements possibly relied upon in the decision to discharge Edmundson are, however, different. These statements involved plaintiff's accusations of official impropriety. He alleged that: (i) the chief of police's building company was improperly hired to construct a squad room for the police station; and, (ii) full-time officers were defrauding the borough. These statements do not deal merely with harmless matters of internal procedure. Instead, if proven true, they suggest that borough money may have been spent in violation of established procedures. Information like this is clearly a matter in which taxpayers would have an interest and, therefore, the statements touch upon a matter of public concern.

■ Turning to the second tier of the protected speech test, I find that in balance, the free speech interest implicated by these statements outweighs the government's interest in efficient operation. My concern is whether the comments will impair discipline, harmony of co-workers, close personal relationships for which personal loyalty and confidences are necessary, and, routine operations. These factors all militate in favor of not protecting the instant speech. A police force requires hierarchial obedience, close reliance on fellow officers, cooperation, and uniform procedures. However, despite the fact that the accusations about the chief's construction company and the full-time officers' subcontracting their work may have impaired the department's efficiency, the effect of the statements would be minimal. Moreover, the allegations involve significant public issues and, therefore, in balance, the First Amendment interest outweighs the government's interest in efficient operation.

### IV. CONCLUSION

I hold that the statements printed in the *Chester County Press,* and the statements possibly relied upon in the decision to terminate Edmundson relating to McCarthy's actions as president of the police association and the negotiation of the collective bargaining agreement are *not* matters of public concern. Summary judgment will be granted in defendants' favor with respect to these statements.

■ I further hold that the statements possibly relied upon relating to both McCarthy's construction company and the full-time officer's subcontracting their work to part-time officers are matters of public concern. Moreover, I find that in balance, the First Amendment interests implicated by these statements outweigh the governmental interest in efficient operation. However, there is no direct evidence linking these statements to the plaintiff's discharge. Thus, summary judgment is not proper because there exists a genuine issue of material fact—i.e., was the decision to terminate plaintiff motivated by his comments relating to either the work awarded to McCarthy's construction company or the full-time police officer's hiring replacement officers. This question must be referred to a finder of fact. An appropriate order follows.

### ORDER

And now this 31st day of March 1995, it is hereby ordered that:

1) plaintiff's motion for summary judgment is DENIED;

2) defendants' motion for summary judgment is GRANTED with respect to the statements printed in the *Chester County Press*, and the statements possibly relied upon in the decision to terminate Edmundson relating to McCarthy's actions as president of the police association and the negotiation of the collective bargaining agreement;

3) defendant's motion for summary judgment is DENIED with respect to the statements possibly relied upon relating to both McCarthy's construction company and the full-time officer's subcontracting their work to part-time officers; and,

4) On April 20, 1995, at 10 AM, I will meet with counsel to discuss preparations for trial.