Rose Mary **MITCHELL**, Plaintiff,

v.

Mike **ESPY** [1], Secretary, Department of Agriculture, Defendant.

Civ. A. No. 89–1465–FGT.

United States District Court,
D. Kansas.

March 8, 1994.

---

1. Pursuant to Fed.R.Civ.P. 25(d)(1), Mike Espy is substituted for Clayton Yeutter as Secretary of the Department of Agriculture.

Barbara Kovarovic Lundin, Lundin & Daniels, Dodge City, KS, for plaintiff.

Stephen K. Lester, Office of U.S. Atty., Wichita, KS, Lawrence S. Cavallaro, Chief, Employee Appeals Staff, Office of Personnel, Dept. of Agriculture, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

THEIS, District Judge.

Plaintiff Rose Mary Mitchell brought this action seeking judicial review of a decision of the Merit Systems Protection Board upholding her removal from employment with the Farmers Home Administration; contesting a five day suspension from work; alleging discrimination on the basis of age, sex and marital status in her suspension and termination; and alleging retaliation for filing a discrimination complaint over the suspension. Trial to the court was held from July 6 through July 9, 1993. The court has received the parties' post-trial briefs and now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiff is a female who was born in 1930. At all times relevant to this decision, plaintiff was single and over the age of 40 years.

Plaintiff began working for the Farmers Home Administration (FmHA), United States Department of Agriculture, in June 1951. At the time plaintiff left her employment with FmHA, plaintiff was a County Office Assistant, GS-5, at the County FmHA office located in Ness City, Kansas. Plaintiff had been working at the Ness City FmHA office since approximately 1978.

On February 19, 1987, plaintiff was suspended from her job for a period of five days. Plaintiff filed both a grievance and a discrimination complaint regarding the suspension.

On May 9, 1988, FmHA proposed to remove plaintiff from her job on grounds of insubordination, uncooperative work behavior and failure to comply with authorized instructions of her supervisor.

Plaintiff's removal was to be effective on October 7, 1988. Plaintiff resigned on October 6, 1988.

Plaintiff appealed her dismissal to the Merit Systems Protection Board (MSPB). An Administrative Judge of the MSPB ruled that plaintiff's resignation was involuntary. After a hearing, the Administrative Judge affirmed the removal. MSPB Record, Vol. VIII at 1749–1779.

Plaintiff filed a petition for review of the Administrative Judge's decision. MSPB Record, Vol. IX at 1784–1815. On July 25, 1989, the MSPB declined to review the decision of the Administrative Judge. MSPB Record, Vol. IX at 1920–1923.

Larry Davis was the FmHA State Director during the relevant time period.

J.W. Smith was the District Director during the relevant time period for the district in which plaintiff worked.

Jerald Bandel was County Office Supervisor for the Ness City FmHA office from 1984 to April 1986. As County Office Supervisor, he was plaintiff's immediate supervisor.

Mark Andy Bogner, a District Loan Specialist, served as Acting County Office Supervisor for the Ness City office from May 1986 to December 1986.

From December 1986 until September 1987, there was no permanent County Office Supervisor for the Ness City office. A series of Assistant County Supervisors worked as temporary supervisors in the Ness City office.

Randy Thiel became County Office Supervisor for the Ness City FmHA office in September 1987. Thiel was plaintiff's immediate supervisor at the time of the proposal to remove and the plaintiff's resignation.

When Bogner first arrived as Acting County Office Supervisor, the plaintiff was authorized to work overtime. Subsequently, the FmHA State Director and the District Director canceled plaintiff's overtime authorization. According to Bogner, there appeared to be a need for overtime, since the Ness City FmHA office had a considerable backlog.

Bogner testified regarding the "jump team." A jump team is a group of employees from other offices who are sent in to another office to help process loans. A jump team visited the Ness City office at least once during Bogner's term there.

After Bogner assumed the duties as Acting Supervisor in Ness City, he made a trip to the St. Louis regional office. Bogner took 20 files with him. Bogner was concerned that documents prepared by the jump team, such as security agreements and financing statements, were missing from the files. Bogner testified that he had scheduled a number of loan closings which had to be rescheduled when the paperwork problems surfaced.

While Bogner was Acting County Office Supervisor, the agency proposed the plaintiff's suspension. Bogner had nothing to do with the proposed suspension.

On September 30, 1986, State Director Larry Davis issued a proposal to suspend plaintiff for 14 days and to transfer her to the position of District Office Clerk, GS–5, Dodge City, Kansas. Plaintiff's Exh. 1.

Prior to issuing his proposal to suspend plaintiff, Davis received a letter dated September 21, 1986 from Marilyn Dickman, Supervisory Personnel Management Specialist, from the FmHA office in St. Louis. Dickman's letter discussed the proposal to suspend plaintiff for 14 days and transfer plaintiff to another location. The letter stated that previous County Office Supervisor Bandel was a weak supervisor who did not address plaintiff's shortcomings. Bandel did not require plaintiff's cooperation and compliance with instructions. Dickman's letter noted that the District Director must have been aware of plaintiff's deficiencies, yet did nothing to correct them. The District Director also should have been aware that Bandel had serious deficiencies which were not addressed. Plaintiff's Exh. 80.

Dickman noted a particular area of concern in the documentation in the running records. Dickman reviewed case files with Bogner and another FmHA employee and concluded that plaintiff had engaged in "creative documentation." Running records which had been copied and mailed to Dickman in June 1986 had new May 1986 entries when reviewed in August 1986. Correspondence which had apparently been forgotten would be sent out weeks later. The date on the

letter would not be changed and the running record would be altered to reflect that the correspondence was mailed on the original date. Running record entries were erased and new entries would be added weeks later. Dickman advised that plaintiff's supervisor must keep a continuous check on these matters. Plaintiff's Exh. 80.

Dickman advised that the supervisor should immediately give plaintiff an accurate position description and objective performance standards. The supervisor should also see that plaintiff receives any training needed for acceptable performance of her job. After a reasonable period of time, action based on job performance could be initiated. Plaintiff's Exh. 80.

Davis had initially considered transferring plaintiff to the State office in Topeka, primarily to keep plaintiff away from the public. Dickman's letter suggested that a transfer to the State office might seem punitive given the great distance involved. Plaintiff could be removed for failure to accept reassignment to the State office; however, Dickman did not believe the agency's position would be sustained by the MSPB. Dickman recommended transferring plaintiff to a District office closer to Ness City. Plaintiff would not necessarily have to move and her access to the public would be more limited and better controlled than in a County office. Plaintiff's Exh. 80.

On September 30, 1986, State Director Larry Davis issued the proposal to suspend plaintiff for 14 days and to transfer her to the District office in Dodge City. Plaintiff's Exh. 1. The proposal was delivered to plaintiff on October 1, 1986. The proposal contained 22 specifications under the following categories: uncooperative work behavior, improper personal conduct, failure to follow agency instructions, incompetency and inefficiency in work performance, and falsification of agency documents.

FmHA Instruction 2045–D, dated March 11, 1987, provides that a State Director may authorize the reassignment or transfer of a career employee when "reassignment to another organizational unit or location will best serve the interest of the Agency. Reassignments cannot be used for disciplinary actions

or to force a resignation or retirement." Plaintiff's Exh. 77. Davis denied that the proposal to transfer plaintiff to Dodge City was intended to be punitive.

Plaintiff appealed the proposed suspension and transfer. Plaintiff was given the opportunity to respond both orally and in writing. The agency's analysis by Marilyn Dickman, Supervisory Personnel Management Specialist, summarized the evidence and recommended that certain specifications be dropped. Dropped completely were the charges of improper personal conduct and falsification of agency documents (and the specifications contained thereunder). Also dropped were several specifications under the remaining three charges. The 28 page analysis also recommended that the proposed suspension be dropped from a period of 14 days to a period of 5 days. It was recommended that the transfer issue be dropped. Plaintiff's Exh. 2.

In his decision to suspend dated February 19, 1987, State Director Larry Davis dropped the specifications as recommended in the analysis. Davis imposed a suspension of 5 days beginning February 23, 1987. Davis stated in his decision that he could no longer tolerate the plaintiff's uncooperative work behavior toward fellow employees or the strained relationship between the Ness City office and members of the public. Davis demanded immediate improvement. Davis declined to return the plaintiff's office keys and again ordered the plaintiff not to be in the office outside of established office hours unless overtime had been approved in advance. Davis warned plaintiff that the situation would be closely monitored and that he would be receiving reports on her compliance. Davis informed plaintiff of her right to file a formal grievance of the action. Plaintiff's Exh. 3.

The proposed charge of improper personal conduct, containing one specification regarding plaintiff's bathroom habits, was dropped in its entirety at the decision stage as noted above. The decision noted that it was not certain who was responsible for leaving the women's restroom in the Ness City office in an unsanitary and unhygienic condition. The

women's restroom was used by all female employees of various federal agencies co-located in the building in Ness City. A letter, signed by five female employees of the co-located federal agencies, attributed the problem to plaintiff. That letter contains a reference to plaintiff's menstrual cycles with a comment that perhaps plaintiff had ceased menstruating, since some of the problems with the unsanitary bathroom conditions had ceased. Plaintiff's Exh. 34. The agency dropped the charge because it was impossible to determine who was responsible for the unsanitary bathroom conditions.

Plaintiff did not agree with the decision to suspend and submitted a formal grievance to the appropriate official in Washington, D.C. on or about April 2, 1987.

In a proposed disposition dated July 23, 1987, Dwight Calhoun, FmHA Deputy Administrator for Management, dropped one specification and upheld the 5 day suspension. The proposed disposition advised plaintiff of her right to a final decision by the Administrator of FmHA. Plaintiff's Exh. 4.

Attached to the proposed disposition was an 18 page analysis of the administrative grievance dated June 19, 1987, prepared by Debra Johnston Petree, FmHA Personnel Management Specialist. Exh. 4.

Plaintiff appealed the proposed disposition of her grievance and also filed a discrimination complaint.

Plaintiff's discrimination complaint alleged that she had been discriminated against because of her marital status, age, sex, and in reprisal for filing a previous EEO complaint.

Neal Sox Johnson, Acting Administrator of FmHA, issued a proposed disposition of plaintiff's complaint of discrimination. Two of the 12 specifications of misconduct were sustained. Johnson found no discrimination. Plaintiff's Exh. 5.

Under the charge of uncooperative work behavior, Johnson found that two of the specifications were fully supported. The first specification charged plaintiff with being uncooperative with the jump team that came to the Ness City office. The jump team members reported that plaintiff kept her back to them and refused to answer their questions. Plaintiff's Exh. 5.

The other specification alleged that on June 2–3, 1986, Leann Decker, Administrative Officer, was in the Ness City office on a review. During this review, Decker asked plaintiff numerous questions which plaintiff refused to acknowledge or answer. Johnson concluded that it was more likely so than not that this incident occurred. Plaintiff's Exh. 5.

Johnson found that other specifications were unsupported by the evidence or demonstrated disparate treatment.

In his proposed disposition, Johnson found there to be no discrimination on the basis of reprisal for previously filed allegations of discrimination. Johnson noted that some of the charges were weakened by contradictory testimony and that the agency's position was weakened by its failure to provide plaintiff with timely performance appraisals. Johnson noted, however, that the evidence soundly supported some of the charges. With regard to plaintiff's allegation of reprisal for denial of overtime authorization, testimony indicated that plaintiff was the only employee whose overtime authorization was rescinded. Johnson noted that management had articulated legitimate nondiscriminatory reasons for taking this action. Johnson found no discrimination because of sex, age or marital status. Plaintiff's Exh. 5.

Johnson's proposed decision advised plaintiff of her right of appeal, including an appeal to the Secretary of Agriculture, an appeal to the Equal Employment Opportunity Commission, and the right to file a civil action in federal court.

On September 27, 1989, the same date as Johnson's proposed decision on the discrimination complaint, the Department of Agriculture issued its final decision on the discrimination complaint. The decision noted that plaintiff had filed the present lawsuit on August 23, 1989. The agency determined that plaintiff's discrimination complaint concerned matters that were raised in the pending civil action. The agency canceled plaintiff's December 16, 1987 complaint of discrimination, pursuant to 29 C.F.R. 1613.215(a)(3). Plain-

**1480**

tiff was advised of her right to appeal the final decision to the Equal Employment Opportunity Commission and/or to file an action in federal district court. Plaintiff's Exh. 8.

Plaintiff appealed to the Equal Employment Opportunity Commission (EEOC). The EEOC's Office of Review and Appeals issued a decision dated December 27, 1989. The EEOC determined that, pursuant to 29 C.F.R. 1613.215(a)(3), the agency properly canceled plaintiff's discrimination complaint on the grounds that she had a pending civil complaint. The EEOC decision advised plaintiff of her right to file a civil action. Plaintiff's Exh. 9.

. Plaintiff's grievance of the five day suspension had been held in abeyance pending the completion of the discrimination complaint proceedings before the Department of Agriculture and the EEOC. In a letter dated December 4, 1990, the Department of Agriculture canceled plaintiff's grievance due to the pending civil action. Plaintiff's Exh. 7.

Plaintiff testified that the agency failed to comply with its own regulations regarding the time frame within which her suspension grievance and discrimination complaint were to be decided.

On October 26, 1987, Leann Decker, Administrative Officer, sent a letter to the FmHA Finance Office in St. Louis, Missouri. Decker forwarded documentation from County Supervisor Randy Thiel regarding plaintiff's working unauthorized overtime. Decker requested that the personnel office review the material and advise whether there was sufficient documentation to support a removal action against plaintiff. Plaintiff's Exh. 19.

On November 23, 1987, Debra Petree of the Finance Office responded to Decker's letter with a preliminary draft of a proposal to remove. Plaintiff's Exh. 20.

On January 7, 1988, Decker sent a draft proposal to remove for Petree's review. The draft proposal charged plaintiff with failure to comply with authorized instructions of a supervisor (26 specifications dealing with staying in the office overtime) and uncooperative work behavior (5 specifications). Plaintiff's Exh. 21.

An undated memorandum identified as having been written by Petree contains the following discussion:

There is nothing about these infractions taken separately or as a whole which would support a removal action. We cannot fire someone after 35½ years of service for a 2nd offense of (1) working extra hours w/o permission and (2) pouting and not talking to the C/S [County Supervisor]. It looks like our reasons are nothing more than pretext for age discrimination.

(1) We can however attempt to support a suspension action or

(2) you have the authority to propose removal. However, I do not think a removal would be supported at the decision stage. The only problem w/ proposing removal under such circumstances is that that [sic] it gives the appearance of a predisposition to take stronger discipline than can be proved appropriate or supported....

What specific harm resulted from RM staying late? to agency mission, to accomplishment of the business of the agency [?] There are no charges indicating that she is incapable or unwilling to perform her work.

Her pouting episodes are a problem but apparently they have not caused the office to shut down and have not adversely affected the relationship with the public. (This is not reflected in the charges).

This case would be a public relations nightmare.

We would be much better off to take more frequent less severe disc [disciplinary] action, i.e., reprimands, suspensions and eventually R.M. will retire or close the office [and] abolish her position and she probably would not move.

. . . .

We must prove that the action is being taken to promote the efficiency of the service. I do not think we can support such a conclusion.

Plaintiff's Exh. 22.

. In a letter to Leann Decker dated February 3, 1988, Debra Petree recommended that the agency proceed with a suspension of plaintiff for 14 days or less rather than re-

moval. Petree stated that a lesser penalty would demonstrate that the agency did everything within reason to coax the employee into changing her behavior prior to terminating her employment. Petree noted, "However, I also recognize that it is within the discretion of the proposing official to select a penalty that he feels is appropriate to the misconduct." Plaintiff's Exh. 23.

On March 25, 1988, Leann Decker sent a revised draft of the proposal to remove to Debra Petree for her review. Included in the draft were 32 charges of failure to follow instructions (involving staying after 5:00 p.m.) and 18 charges of uncooperative work behavior. Handwritten notes reflect suggested modifications, including a suggestion that several incidents of uncooperative behavior were actually insubordination. Plaintiff's Exh. 24.

On May 9, 1988, State Director Larry Davis issued plaintiff a proposal to remove. The proposal contained three charges: insubordination by refusal to comply with proper instructions, uncooperative work behavior, and failure to comply with authorized instructions of supervisor. In the 17 page proposal to remove, Davis discussed each of the 43 individual specifications. Plaintiff was advised of her right to respond to the charges both orally and in writing. Plaintiff's Exh. 10.

After plaintiff's oral and written responses to the charges, Robert E. Sherman, Acting Deputy Administrator for Management, FmHA, issued his decision to remove. Plaintiff was advised of her right to appeal to the Merit Systems Protection Board (MSPB). Plaintiff's Exh. 11.

Sherman's decision to remove was based upon an analysis dated September 14, 1988 prepared by Lawrence Scanlan, FmHA Employee Relations Specialist, who heard plaintiff's oral reply. The 24 page analysis discussed each of the 43 specifications and recommended that 7 specifications be dropped. The analysis also discussed aggravating and mitigating factors used in the determination of the appropriateness of the penalty. The analysis concluded that the proposed termination would promote the efficiency of the service. Plaintiff's Exh. 12.

On appeal, the MSPB affirmed the agency's actions.

The court shall discuss the testimony presented at trial regarding several of the charges of misconduct.

*Organization of office*

County Office Supervisor Randy Thiel testified that when he arrived at Ness City in September 1987, the FmHA office was cluttered and the furniture and filing cabinets were inefficiently arranged. On his first day in the Ness City office, Thiel discussed with plaintiff that changes in the office arrangement would be needed. Thiel solicited plaintiff's input, but she had no response.

That first evening, after plaintiff had gone home, Thiel rearranged some filing cabinets and office furniture. The next day, the plaintiff appeared to be upset and would not speak to Thiel.

Some days later, plaintiff confronted Thiel, demanding to know what right he had to change the furniture and files. Plaintiff again refused to speak to Thiel after he declined to change the filing system back to its original arrangement. These events gave rise to a charge of uncooperative work behavior.

Events occurring on February 18 and 19, 1988 gave rise to charges of uncooperative work behavior and insubordination.

Thiel called a staff meeting for 3:45 p.m. on February 18. Plaintiff testified that at the meeting, Thiel informed her that her job description did not require her to meet the public, so he was moving her desk to the computer room. Plaintiff apparently did not say anything to Thiel at the meeting. Plaintiff left a note on Thiel's desk which stated, "Thiel[.] I prefer my desk where it is[.] Will discuss tomorrow[.]" Plaintiff's Exh. 44.

Thiel testified that he attempted to discuss with plaintiff the location of the furniture and the phones. The FmHA office was getting a new phone system, requiring the installation of new phone jacks. Thiel asked plaintiff where she thought would be the best location for the new phone jacks, but plaintiff did not respond. While plaintiff was at lunch on

February 19, Thiel moved her desk to the computer room.

Later that day, the contractor arrived to install the new telephone jacks. Thiel instructed the contractor where to locate the jacks. Plaintiff interrupted and told the contractor to install them in different locations. Plaintiff insisted that her desk was not going to be moved and that the phone jacks were to be installed where she said. Thiel testified that he had to ask plaintiff to excuse herself from the conversation.

Thiel had previously received approval from the State Office regarding the installation of the new telephones.

On February 19, 1988, after the incident regarding the phone jacks, plaintiff went into the computer room and shut the door. Thiel instructed plaintiff to keep the door open, but plaintiff repeatedly closed the door. Thiel told plaintiff that if she refused to keep the door open, he would have it removed. Plaintiff then closed the door part way.

At trial, plaintiff denied being present in the office to interfere with the movement of the desk. Plaintiff was not charged with insubordination for any attempt to interfere physically with the movement of the office furniture. The charge of insubordination involved giving the phone installer contradictory instructions as to the location of the new phone jacks and closing the door to the computer room after being instructed to leave it open.

Plaintiff denied telling Thiel that he could not move her desk. The court finds it more likely true that plaintiff informed Thiel that he had no right to move her desk, or words to that effect.

On February 25, 1988, Thiel wrote plaintiff the following memo outlining his reasons and authority for moving the furniture:

The following letter is a written explanation of why the furniture arrangement was necessary and to clarify some very important points. I apologize for not getting this to you sooner but I have found it very difficult to expend the time necessary to prepare.

The movement of the furniture was necessary for several reasons. First, I was responsible to see that the new phone system was installed in a manner that would prove workable for this office. I did not want to locate the phone jacks in locations that would need to be changed in the future as this is an unnecessary expense to the Government.

Secondly, at the time the decisions were made, I was expecting another permanent COC [County Office Clerk] employee within one week. As you know, she has since declined the position, but I still intend to fill the position as soon as possible. We are to receive two new secretarial desks in the very near future.

The reason I chose to locate your work station in the north room was to provide you with a more private work area, better access to the computer terminal, and to relieve you of the mundane duties of greeting the public. Your position and job duties are too vital to this office to have you being distracted by those things which subordinate employees can handle. Your desk is located so you can still see who comes into this office in the event no one is present in the main area.

This move was discussed with State Office personnel and is intended for your benefit as well as the overall benefit of the office. I hope the placement of the operational files, instruction manuals, and copy machine location will help in the efficiency of the office.

The final area I would like to address is the door to the north room. The door will remain open at all times. The reason is, this room is not your private office. It is intended to provide you with privacy but all employees must have readable [sic] access. It has also been brought to my attention that the door must remain open for proper operation of the heating and cooling systems. I would like to make it very clear that if the door does not reamin [sic] open it will be removed. I also wish to make it clear that all furniture placement is to remain as I have placed them. If you have problems or want to make changes then approach me with your ideas

and reasons and I will gladly consider them.

Defendant's Exh. H.

Plaintiff testified at trial that she was not angry about the furniture rearrangement. Plaintiff denied telling Thiel that he had no right to move the furniture. Plaintiff also testified that there was no problem with the door to the north room. Plaintiff denied expressing displeasure over the moving of the file cabinets. The court found plaintiff's testimony on this subject to be incredible.

*Computer training*

In early 1988, Thiel observed that plaintiff appeared to be having trouble using the computer. Thiel requested that Connie Blankenship come to the office to conduct some training with plaintiff. Thiel later learned that plaintiff called Blankenship attempting to cancel the training.

On February 10, 1988, Blankenship was at the Ness City office to provide the requested training. Plaintiff was charged with uncooperative work behavior for her conduct on that day. Plaintiff was resistant to training and stated that she did not need help.

While Blankenship was there, Thiel requested training on two computer functions, both of which required passwords. Thiel testified that plaintiff had the passwords and that he had difficulty getting them from her. Plaintiff gave them one password verbally, but since the password was not spelled the way it sounded, they misspelled it. Plaintiff would not write the password down for them. Plaintiff insisted on typing in the second password herself, although she had been instructed to give it to them. Plaintiff did eventually write the password down for them.

Plaintiff testified that she had received computer training in May 1987 and that she had not requested additional computer training. Plaintiff relies on a Department of Agriculture Personnel Letter which is inapplicable to her situation. Personnel Letter 432–1, dated August 1, 1983, is entitled "Reduction in Grade and Removal Based on Unacceptable Performance." Plaintiff relies on the following provision, "Instances of deteriorating or unacceptable performance

should be discussed promptly with employees, and documentation should be maintained of such discussions." Plaintiff's Exh. 17, p. 4, Subchapter 2, section 2–2. As indicated by the title of the document, the topic addressed is removal of an employee based on unacceptable job performance. Section 2–1 of Subchapter 2 demonstrates the inapplicability of this provision to plaintiff: "An employee may be reduced in grade or removed at any time during the performance appraisal cycle that the employee's performance becomes unacceptable in one or more critical elements of the job and the employee has been given an opportunity to improve." Plaintiff was not removed for unacceptable performance of a critical element of her job.

Plaintiff testified that she was responsible for requesting training for herself. FmHA Instruction 2057–A, section 2057.9(h)(1) provides that employees are responsible for requesting training. Plaintiff's Exh. 51. However, supervisors are responsible for recommending training for subordinate employees and for training employees. Plaintiff's Exh. 51, section 2057.9(g).

*Cancellation of service visit*

Thiel testified regarding the repair of the office copy machine, which gave rise to a charge of uncooperative work behavior. Thiel instructed County Office Clerk Judy Heinrich to arrange to have a repairperson come to the Ness City office for a service call. Someone subsequently called to cancel the service call. Thiel believed that plaintiff must have called to cancel the service call. Thiel acknowledged that he had no proof as to who canceled the service call, but that he knew the call was made from the Ness City FmHA office.

*County Office Operating Report*

Prior to April 1988, it was plaintiff's responsibility to prepare the County Office Operating Report ("COOR report"), which is due on the last day of each month. On April 27 and 28, 1988, FmHA Program Review Assistant Don Etta Moser was in the Ness City office to train County Office Clerk Judy Heinrich to prepare the COOR report. Plaintiff was charged with insubordination for her conduct on those two days.

Thiel testified that the COOR report is a summary of what was done in the office each month. Thiel testified that county office employees are to keep track of various matters throughout the month for inclusion in the COOR report. Thiel testified that the Ness City county office had the lowest performance rating of any county office.

In April 1988, preparation of the COOR report was plaintiff's duty. Thiel wanted Heinrich to learn to prepare the report. Thiel testified that the task of preparing the COOR report could be given to a lower graded employee (Heinrich) so that the higher graded employee (plaintiff) could perform more difficult tasks.

Thiel testified that Moser experienced difficulty in obtaining information from plaintiff, specifically plaintiff's "tally sheet," containing the current month's data. Plaintiff responded that Moser and Heinrich did not need to prepare the report and that she (plaintiff) would take care of it. On the morning of April 28, Moser and Thiel again asked plaintiff for her tally sheet. Plaintiff was argumentative and insisted she would take care of it. Plaintiff refused to provide the information requested.

Don Etta Moser testified that her duties as Program Review Assistant included conducting annual reviews of each county office, assisting county offices with loan processing during busy periods, and training County Office Assistants/County Program Technicians and County Office Clerks. Moser was assigned to two Districts in the western half of Kansas, which included the Ness City office.

Moser testified about training County Office Clerk Judy Heinrich to prepare the COOR report in April 1988. Moser was instructed by State Director Davis to train Heinrich to prepare the report. Moser testified that the State Director was attempting to relieve the pressure and stress on the plaintiff and give plaintiff the time to perform higher level tasks.

Moser testified that each employee in a county office is to keep a tally sheet of services performed each month. Moser needed plaintiff's tally sheet and asked plaintiff several times for it. Plaintiff refused to give her tally sheet to Moser. Moser suspected that plaintiff did not have a tally sheet.

Moser telephoned State Director Davis, who instructed Moser to ask plaintiff again for the tally sheet. Again, the plaintiff refused. County Supervisor Thiel also asked plaintiff for her tally sheet. Plaintiff again responded that she would prepare the report. Moser never obtained plaintiff's tally sheet.

Plaintiff testified that she did not know why Moser wanted the tally sheet and that Moser was determined to prepare the COOR report. Plaintiff testified that she did not prepare her tally sheet until April 30 and that Thiel and Moser knew that plaintiff did not have it prepared on April 27–28.

Plaintiff testified that it was her duty to train the County Office Clerk and that it was not within Moser's job description to train the clerk. Plaintiff relies on an undated document entitled Kansas Instruction 2045–Q, Plaintiff's Exh. 47. This document states that, with the assistance of the Program Review Assistant, the County Supervisor is responsible for training the County Office Assistant. The County Office Clerk is trained by the County Supervisor and the County Office Assistant. While this document appears to support the plaintiff's position, it nowhere provides that the County Office Assistant has the exclusive right to train the County Office Clerk.

Plaintiff relies on Moser's performance elements and standards in support of her position that Moser had no duty to train the County Office Clerk. Plaintiff's reliance on that document is misplaced. Under Element IV, Training and Instruction of personnel, the following standard is found: "Trains and instructs field personnel, including new COA's [County Office Assistants] in accordance with appropriate instructions." Plaintiff's Exh. 46. This standard provides that a Program Review Assistant is authorized to train field personnel, which includes the County Office Clerk.

*Performance Elements and Standards*

Leann Decker was Administrative Officer with FmHA during the relevant time period.

Decker discussed plaintiff's performance appraisal dated June 28, 1985, Plaintiff's Exh. 30. A "critical element" is given double weight in the appraisal process. An employee can be removed if his/her performance is unacceptable in one or more critical elements of the job and the employee has been given the opportunity to improve. Plaintiff's Exh. 17. Plaintiff was not terminated for unacceptable performance in a critical element of her job.

Plaintiff's performance elements and standards for the period July 1, 1984 to June 30, 1985 (Plaintiff's Exh. 41) remained in effect until the establishment of new standards. Included in the performance element Office Management Support is the standard, "Does not work any overtime unless approved in accordance with FLSA regulations." Under the element Public Relations is the standard, "Maintains a good working relationship with co-workers and other FmHA personnel." Plaintiff's Exh. 41. Decker acknowledged that FmHA could not terminate plaintiff based on her noncompliance with these performance standards because they were not critical elements of the job.

Decker testified that in February 1988, the agency established new elements and standards for plaintiff's position. The agency rated plaintiff in July 1988 on the new elements and standards. The appraisal was subsequently dropped by the agency because the appraisal period began in September 1987 while the plaintiff's new performance elements and standards did not take effect until February 1988.

Prior to February 1988, plaintiff's last set of elements and standards were established on July 2, 1984. The elements of plaintiff's job were: (1) processes loans, (2) services loans, (3) office management support, and (4) public relations. Each element had a corresponding list of performance standards. Servicing loans was the only "critical element" of plaintiff's job. Plaintiff's Exh. 41. Plaintiff's job performance had been evaluated on July 2, 1985 by County Supervisor Bandel. On a scale of 1 to 5, plaintiff's ratings were as follows: (1) process loans—4; (2) services loans—3; (3) office management—3; and (4) public relations—3. Her composite appraisal was 3.2. Plaintiff's Exh. 30.

On February 4, 1988, a meeting was held with District Director Smith, County Supervisor Thiel, and the plaintiff at the Ness City office to discuss plaintiff's new performance elements and standards. Two sets of standards were under consideration, one prepared by plaintiff and one prepared by Thiel. Plaintiff objected to the adoption of the performance standards prepared by Thiel. Smith and Thiel agreed to use the performance standards prepared by plaintiff as long as one additional standard was added. Smith and Thiel directed plaintiff to type the additional standard onto her document. When plaintiff refused to make the change, Thiel typed it himself. Plaintiff was then asked to sign the new standards, which she refused to do.

FmHA Instruction 2060–A (effective December 2, 1987) discusses the preparation of "performance plans" for employees. This instruction provides that a performance plan is to be established and communicated in writing within 30 days of the beginning of each appraisal period. Performance plans are to be reestablished or revised whenever a work assignment changes significantly. Employees are to be informed and allowed to participate in any revision and changes made to their written performance plans. Plaintiff's Exh. 43.

Section 2060.7(b) of FmHA Instruction 2060–A provides:

*Employee participation in establishing performance plans.* Supervisors and managers have a major responsibility to ensure consistency, objectivity, and equity in the development of performance elements and standards and the subsequent appraisal of performance against these standards. Elements and standards must be based on the requirements of the employee's position. Communication between the supervisor and the employee is essential in this process. The identification of performance elements and the establishment of performance standards require joint participation of the supervisor and the employee in developing performance plans. Final authority for establishing elements and standards

rests with the supervisory officials. Joint participation may be accomplished by means including, but not limited to, the following:

(1) Employee and supervisor discuss and develop performance plan together.

(2) Employee provides supervisor a draft performance plan.

(3) Employee comments on draft performance plan prepared by the supervisor; or

(4) Employees who occupy similar positions prepare performance plan(s) with supervisor's approval.

Plaintiff's Exh. 43.

Plaintiff testified that performance elements and standards are supposed to be prepared by the employee and the supervisor jointly. The court agrees with this general proposition, but notes that the final authority for establishing elements and standards rests with the supervisor.

Plaintiff did not sign the performance elements and standards worksheet. Plaintiff relies on a document entitled "Attachment to FPM Bulletin 432–10" (Plaintiff's Exh. 42). This document, which is undated, purports to present various personnel matters in a question and answer format. The section relied upon by plaintiff provides as follows:

2.Q. Is it necessary to have the employee sign a statement saying that he or she has received and understands his or her performance elements and standards?

A. No. There is no requirement in law or OPM regulation that an employee must sign a statement acknowledging receipt and understanding of performance elements and standards. However, if challenged on appeal, the agency must be able to show that "the appellant was made aware of and should have understood the performance standards and critical elements of the position at the beginning of the appraisal period which forms the basis of the adverse action." *Cross v. Air Force*, 25 M.S.P.R. 353 (1984); *Weirauch v. Army*, 782 F.2d 1560 (Fed.Cir.1986).

In anticipation of a challenge on appeal, the agency should maintain evidence of the conveying and receipt of performance elements and standards, as well as counseling sessions or discussions with the employee regarding the requirements of the position, documents issued to clarify the elements and standards, or evidence of any other situation in which the agency answered questions or clarified the elements and standards. Alternatively, the agency may wish to rely on the obvious clarity of the elements and standards themselves if they have been properly communicated.

Plaintiff's Exh. 42. There is no dispute that plaintiff received the performance elements and standards document.

Plaintiff asserts that she could not have been insubordinate from her refusal to sign the elements and standards document, since she was not required to sign that document. However, plaintiff was not charged with insubordination for her refusal to sign the document. She was charged with insubordination for her refusal to type a job performance standard onto the document when directed to do so by Thiel and District Director Smith. See Plaintiff's Exh. 10.

*Staff meetings*

Thiel testified that on February 29, 1988 he called a brief "stand-up" staff meeting at the beginning of the day. Thiel called the meeting in the computer room around plaintiff's desk, since Thiel had experienced problems with plaintiff not coming to staff meetings. While Thiel was speaking, plaintiff turned away and went over to the filing cabinet. Thiel instructed plaintiff to mail out some notices which should have been sent the previous November. Thiel and Clerk Judy Heinrich ended up doing the large majority of this task.

Thiel testified regarding a stand-up staff meeting which occurred on March 7, 1988. Thiel and plaintiff were going to be out of the office for several days. Thiel instructed plaintiff to give Heinrich ample work assignments to do while they were gone. Plaintiff gave Heinrich a few minor tasks to perform, but not enough to keep her busy. Thiel testified that there was a large backlog of

filing to do, but that Heinrich had not received any training on filing.

Plaintiff was charged with insubordination for these two incidents.

*Staying after 5:00*

Prior to June 1986, plaintiff was authorized to work overtime.

On June 2 and 3, 1986, a review of the Ness City County Office was performed by Administrative Officer Leann Decker and other FmHA employees. On June 2, Temporary Assistant County Supervisor Kris Huxman told Decker that plaintiff often stayed in the office late at night. Huxman stated that one night she had been out with friends and stopped by the FmHA office at 1:45 a.m. to pick up something she had left there, and discovered plaintiff at work. Decker reviewed plaintiff's time records and discovered that in 1985, plaintiff had worked 311 hours of overtime from pay period three through pay period nineteen. Decker found advance approval for 160 hours of overtime. Decker could find no advance approval for the 151 hours of overtime occurring from pay period three through pay period eleven of 1985. On June 2, Decker drove to the FmHA office at 9:30 p.m. and found plaintiff's car in the parking lot and the lights on in the FmHA office. In a memo dated June 4, 1986, Decker advised State Director Larry Davis that plaintiff was working an excessive amount of time. MSPB Record, Vol. V at 1065–1069.

Plaintiff received a letter dated June 9, 1986 from State Director Davis. That letter provides as follows:

> On June 4, 1986, it was brought to my attention that you have been staying at the office beyond the normal working hours (8:00 a.m. to 5:00 p.m. with an hour for lunch). I realize you have had an overtime authorization for the last seven pay periods from the District Director; however, I have been advised that you are staying in the office beyond the authorized overtime period on a continuous basis.
>
> In accordance with FmHA Instruction 2051–H employees are not to work beyond their regular tour of duty and any period of authorized overtime. In order to ensure compliance with regulations, I have in-structed Andy Bogner, Acting County Supervisor, to remove the office keys from your possession.
>
> Effective June 4, 1986, you are instructed to work your regular tour of duty from 8:00 a.m. to 5:00 p.m. with one hour for lunch Monday through Friday. You are not to be in the office at any time other than that stated in this paragraph.
>
> Any non-compliance with these instructions shall be subject to disciplinary action.

Defendant's Exh. B.

Davis testified that he could not allow an employee graded GS–8 or below to work unauthorized overtime without payment of overtime compensation. Davis testified that early in his tenure as State Director, an FmHA employee was awarded overtime compensation, notwithstanding agency warnings to the employee not to work overtime. This employee was awarded approximately $22,-000.00 in back pay for unauthorized overtime work.

In the September 30, 1986 proposal to suspend, plaintiff was charged with failure to follow agency instructions for violating Davis' instructions regarding work hours contained in the June 9, 1986 letter. Plaintiff's Exh. 1.

Before Randy Thiel assumed his duties as County Supervisor in the Ness City office, Davis discussed the condition of the office with him. Davis informed Thiel that the deficiencies in the office needed to be corrected and that clerical and supervisory assistance would be given to help the office get up to date. Davis also informed Thiel that no employee graded GS–8 or below could work any overtime unless it was authorized in advance. Davis instructed Thiel to watch the plaintiff and see that overtime did not occur.

Because of the directive from the State Office that plaintiff was to work no overtime, on his first day in the office, Thiel instructed the plaintiff to work her regular 8:00 to 5:00 schedule, that no overtime was approved, and that she was not to work overtime.

On October 8, 1987, Randy Thiel gave plaintiff the following letter:

You are hereby given written notice that the following work schedule must be strictly adhered to:

8:00 a.m.—Report for duty and be ready to work

12:30–1:30 p.m.—Lunch break

4:45 p.m.—Begin shutdown of office and prepare to leave

5:00 p.m.—Leave County Office

*—Two ten minute breaks may be taken, 1 in the a.m. and 1 in p.m.

—Breaks will not coincide with starting time, lunch break, or quitting time.

Until notified differently, you are NOT authorized to work any overtime.

Negligence [sic] of this work schedule may result in disciplinary actions.

Defendant's Exh. D. Plaintiff and Thiel went over the memo together. Plaintiff signed the document under protest. Thiel testified that plaintiff maintained fairly regular hours for about a week after receiving this memo.

Thiel kept a daily log and made a note of when plaintiff left the office. Thiel testified that he frequently had to tell plaintiff to leave at 5:00. Thiel testified that if he was present in the office, plaintiff might stay until 5:30 p.m. When Thiel was not in the office, plaintiff's hours varied, but she sometimes stayed until late in the evening.

In the proposal to remove, the agency charged plaintiff with 24 specifications of Failure to Comply with Authorized Instructions of a Supervisor. These 24 specifications all involved the plaintiff's failure to comply with instructions that she not be in the office except during her normal working hours. Two specifications were dropped because they involved days when plaintiff came into the office on vacation days to make copies of documents relevant to her EEO complaint. The 22 sustained specifications involved instances when plaintiff remained in the office after 5:00 p.m., despite numerous oral and written warnings from Thiel, District Director Smith, and State Director Davis.

As County Supervisor, Thiel was required to certify plaintiff's time and attendance for payroll purposes. Thiel signed plaintiff's Time and Attendance Reports, certifying that plaintiff worked 80 hours per 2 week period. See Plaintiff's Exh. 59–66, 70. These exhibits reflect days for which plaintiff was charged with remaining in the office after 5:00. The time and attendance reports do not indicate any overtime compensation is due.

Plaintiff submitted as Exhibits 67 and 68 excerpts from FmHA Instruction 2051–H. Section 2051.370(g) provides, "The FLSA requires that any time which a manager [or] supervisor suffers or permits an employee to perform work must be counted as 'hours of work.' Under this concept any work performed prior to, or after, the normal work hours or during the prescribed lunch period, whether requested or not, is working time if the manager or supervisor knows or has reason to believe it is being performed or accepts the work or product of the work performed." Plaintiff's Exh. 67. Work is suffered or permitted when it is performed by an employee for the benefit of FmHA, whether requested or not, provided the supervisor knows or has reason to believe that the work is being performed and has the opportunity to prevent the work from being performed. Plaintiff's Exh. 68.

Plaintiff contends that since she was certified at 40 hours a week for payroll purposes, she did not work "overtime." Plaintiff also argues that nowhere has the agency alleged that she worked overtime within the meaning of the Fair Labor Standards Act. Plaintiff's argument misses the point. Whether plaintiff worked overtime within the meaning of the Fair Labor Standards Act for which she should receive overtime compensation is not an issue for determination in this case. Whether plaintiff refused to comply with lawful and proper instructions of her superiors regarding her tour of duty is an issue in the present case.

Thiel testified that on October 15, 1987, he left the office at 4:30 knowing that some clients were coming into the office before 5:00. Thiel remained nearby to observe the office and saw the clients arrive at 4:55. Thiel did not return to the office to assist plaintiff. The clients left at 5:16 and plaintiff

left at 5:26. Plaintiff testified at trial that Thiel never informed her that it was improper for her to stay after 5:00 p.m. to assist a borrower who arrived shortly before closing. Thiel testified that this particular incident was unavoidable in an office that serves the public. The plaintiff was not charged with staying past 5:00 for this incident.

Plaintiff testified that on February 18, 1988, Thiel authorized Heinrich to work fifteen minutes late and to come in fifteen minutes late the next day. See Plaintiff's Exh. 37 (Thiel's log). Thiel had called a staff meeting for 3:45 on February 18, 1988. Plaintiff was asked four times to come to the meeting (twice by Thiel and twice by Heinrich). Plaintiff did not come to the meeting until 4:00. Heinrich's failure to leave at her normal quitting time of 4:00 appears to have been the fault of plaintiff for being late to the staff meeting. This incident gave rise to a charge of uncooperative work behavior.

Plaintiff testified that on March 7, 1988, Judy Heinrich, the part-time clerk, worked fifteen minutes late. Randy Thiel informed Heinrich to come in fifteen minutes late the next day. See Plaintiff's Exh. 39 (Heinrich's journal). Plaintiff testified that Thiel never gave plaintiff the opportunity to come in late the next day when she (the plaintiff) had to work late.

Thiel testified that flex time was not available in 1987–1988. There were definite office hours, which coincided with plaintiff's hours. Thiel testified that authorizing overtime for plaintiff would not have increased the efficiency of the office.

Thiel testified that when he found plaintiff in the office after hours, plaintiff was working, and not performing personal business.

Plaintiff testified that she did not remember whether she ever went to the office on weekends or evenings. The court found plaintiff's trial testimony on this subject to be incredible. In her oral reply to the proposal to suspend, the plaintiff admitted to working extra hours and stated that she was basically donating her time to the agency. MSPB Record, Vol. VI at 1252.

*Plaintiff's replacement*

After plaintiff's resignation, Bonita Pfannenstiel was hired to replace plaintiff. Pfannenstiel was 25 years old and married.

Pfannenstiel applied for federal employment in a standard form application which was signed and dated March 2, 1988. The application indicated that Pfannenstiel would be available in November 1988. Plaintiff's Exh. 26. It is not clear when this application was submitted to FmHA. The first page of the application bears a date stamp that appears to read, "OCT 13 1988."

Pfannenstiel passed the Civil Service Exam in March 1988, prior to the agency's proposal to remove plaintiff. Pfannenstiel testified that she desired to get her name back on the register for possible employment. She was not aware of any vacancies in the Ness City FmHA office at the time.

Pfannenstiel was hired in November 1988 as County Office Assistant, GS–4. The County Office Assistant position since been abolished and replaced with the upgraded County Program Technician position. Pfannenstiel is still employed with the FmHA in Ness City as a County Program Technician, GS–6.

*Credibility determinations and findings on discrimination issues*

The court found plaintiff to be an incredible witness. Plaintiff was vague, nonresponsive, and claimed an incredible lack of knowledge of various incidents on cross examination.

As for the sustained charges of misconduct on which evidence was presented at trial, the court finds that plaintiff did commit those infractions. As for the charges for which no testimony was presented at trial, the documentary evidence supports a finding that plaintiff likewise committed those infractions.

Plaintiff's refusal to leave the office at 5:00 was persistent and willful. She had been warned numerous times, orally and in writing that she must leave the office at 5:00. She chose to disregard direct orders of her supervisors.

The evidence presented at trial indicated that no other agency employees had their

overtime authorizations revoked. However, from the evidence presented at trial, it also appears that no other agency employees abused an overtime authorization in the same manner as plaintiff.

Plaintiff refused to cooperate with Thiel's efforts to increase the efficiency of the office. She objected to the delegation of additional duties to the County Office Clerk. Plaintiff rejected all suggested changes in procedure.

The court found no evidence to support plaintiff's position that the agency manufactured the case to discipline her due to her age, sex and marital status or in retribution for previous complaints she made of employment discrimination.

The court found no evidence to support plaintiff's position that the agency attempted to provoke plaintiff into conduct for which it could remove her. The agency did not send in outside employees to interfere with plaintiff's performance of her job, but to assist plaintiff in processing the backlog. The agency's cancellation of plaintiff's overtime authorization was not to prevent plaintiff from getting her work done, but was a result of plaintiff's abuse of the overtime that was authorized.

The agency gave plaintiff verbal and written notice that her conduct was unacceptable and could be grounds for eventual discipline, including termination.

Plaintiff's job performance was not used as a basis for her removal.

The court finds that the agency did not discriminate against plaintiff on the basis of age in charging her with improper personal conduct regarding her bathroom conduct. The court finds that the improper personal conduct alleged more likely than not occurred.

Testimony was presented at trial that the agency initiated disciplinary action against a male employee for improper personal conduct based on his toilet habits.

The court finds no evidence of discrimination in the fact that Pfannenstiel may have filled out and submitted an application for employment before plaintiff's position became available. The court found Pfannen- stiel's testimony credible that she was aware of no vacancies but that she simply wanted her name on the list in case a vacancy arose.

The court finds no credible evidence of discrimination by the agency in the suspension action.

The court finds no credible evidence of discrimination in the proposed transfer. The court finds that the transfer was proposed for a legitimate reason, so as to lessen plaintiff's contact with the public.

Plaintiff has failed to meet her burden of persuading the trier of fact that the defendant intentionally discriminated against her on the basis of any protected characteristic or in retaliation for previous discrimination charges.

### CONCLUSIONS OF LAW

The court has jurisdiction over the parties and the subject matter, except as noted below. Venue is proper in this district.

Plaintiff's original complaint alleged that she was suspended for five days in February 1987, which she appealed both as a grievance and as a complaint with the equal employment opportunity department of the FmHA as conduct prohibited by sex, age, and marital status discrimination. Plaintiff alleged that while her discrimination complaint and grievance of the five day suspension were pending, she was discharged in retaliation for making the discrimination complaint. Plaintiff also alleged that the MSPB action upholding her removal was arbitrary and capricious, an abuse of discretion, not in accordance with the law, and not supported by the evidence. Doc. 1.

Plaintiff's amended complaint added a third count alleging both a discrimination and non-discrimination claim regarding the handling of the grievance and the discrimination complaint regarding her five day suspension. The agency canceled the discrimination complaint because the plaintiff had filed this civil action. The Equal Employment Opportunity Commission affirmed. Plaintiff asserts that the agency has never resolved her grievance and that it has not abided by its rules and regulations in processing the discrimination complaint. Plaintiff alleged that the Equal

Employment Opportunity Commission wrongfully canceled the discrimination complaint. Doc. 8.

The Pretrial Order contains the following claims. Plaintiff claims that she was wrongfully discharged and deprived of her property interest in her employment without due process of law. Plaintiff contends that the agency committed acts of unlawful discrimination when it took her keys, canceled her overtime authorization, suspended her for one week in 1987 and removed her in 1988. Plaintiff contends that the decision of the MSPB upholding plaintiff's removal should be reversed. Plaintiff asserted that she was entitled to recover on the following theories: that she was deprived of a property interest in employment without due process of law in that she was not able to fully and fairly exhaust her rights; that the decision of the MSPB was arbitrary, capricious, an abuse of discretion, not in accordance with law, and not supported by substantial evidence; and that she was terminated because of discrimination on the basis of sex, age and marital status and in reprisal for her pending discrimination complaint.

In her trial brief and post trial brief, plaintiff added a claim of violation of her right to free speech.

This case is of the type commonly referred to as a "mixed case":

Where a petition for review of a MSPB decision involves both discrimination and other claims it is considered a "mixed case." On the discrimination claim, the petitioner "shall have the right to trial de novo by the reviewing court." 5 U.S.C. § 7703(c). The other, non-discrimination claims, however, are reviewed on the administrative record. *Hayes v. United States Gov't Printing Office*, 684 F.2d 137, 141 (D.C.Cir.1982). Normally, pursuant to 5 U.S.C. § 7703(b)(1), the Federal Circuit has exclusive jurisdiction over appeals from the MSPB, except where, as here, the appellant's claim includes an allegation of discrimination. *See* 5 U.S.C. § 7703(b)(2). *See also Wall v. United States*, 871 F.2d 1540, 1542 (10th Cir.1989), *cert. denied*, 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990); *Romain v. Shear*, 799 F.2d 1416,

1421 (9th Cir.1986), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 840 (1987).

*Williams v. Rice*, 983 F.2d 177, 179–80 (10th Cir.1993).

## I. DISCRIMINATION CLAIMS

Plaintiff brings claims for disparate treatment, asserting that she was discriminated against on the basis of her age, sex and marital status. Plaintiff also claim that she was terminated in retaliation for filing a discrimination complaint regarding her suspension.

Title VII of the Civil Rights Act provides that all personnel actions affecting federal government employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a).

The Age Discrimination in Employment Act provides that all personnel actions affecting federal government employees "who are at least 40 years of age ... shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a).

Plaintiff alleges discrimination on the basis of her marital status. Plaintiff cites the Merit System Principles contained in the United States Code, Title 5, Chapter 23, in support of her claim that marital status is a protected characteristic. 5 U.S.C. § 2301(b)(2) provides:

Federal personnel management should be implemented consistent with the following merit system principles:

 . . . . .

(2) All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights.

Prohibited personnel practices include the discrimination against any employee—

(A) on the basis of race, color, religion, sex, or national origin, as prohibited under

section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–16);

(B) on the basis of age, as prohibited under sections 12 and 15 of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 631, 633a);

(C) on the basis of sex, as prohibited under section 6(d) of the Fair Labor Standards Act of 1938 (29 U.S.C. 206(d));

(D) on the basis of handicapping condition, as prohibited under section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791); or

(E) on the basis of marital status or political affiliation, *as prohibited under any law, rule, or regulation;* ...

5 U.S.C. § 2302(b)(1) (emphasis added).

■ Merit systems principles may be used to interpret a law, rule, or regulation asserted to have been violated by a government agency personnel practice. The merit principles do not in themselves provide an independent cause of action or an independent basis for jurisdiction and cannot be considered in the absence of a law, rule, or regulation alleged to have been violated. *Phillips v. General Services Administration,* 917 F.2d 1297, 1298 (Fed.Cir.1990).

■ Plaintiff has identified no statute, rule or regulation providing a cause of action for discrimination on the basis of marital status or providing a basis for this court's jurisdiction. Therefore, this claim must fail as a matter of law. Assuming that the claim based on marital status was a valid claim, the plaintiff presented no evidence from which the court could find that the defendant discriminated against her on the basis of her marital status.

■ When alleging disparate treatment, the plaintiff must prove by a preponderance of the evidence that the defendant had a discriminatory motive or intent. *Sorensen v. City of Aurora,* 984 F.2d 349, 351 (10th Cir. 1993). This may be done either by direct proof of discriminatory intent or more commonly through the well-established burden-shifting format. *Id.* at 351–52.

Plaintiff presented no direct evidence of discriminatory intent on the part of defendant.

· Analysis of the plaintiff's claims under Title VII and the ADEA thus begins with the burden-shifting format set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). At step one, the plaintiff is required to prove a prima facie case of discrimination. Once the plaintiff has established a prima facie case, the burden of production shifts to the defendant to rebut the presumption of discrimination. The defendant may rebut the presumption by articulating some legitimate, nondiscriminatory reason for the employment decision. This burden requires the articulation through some proof of a facially nondiscriminatory reason for the employment decision. If the defendant succeeds in rebutting the presumption of discrimination raised by the prima facie case, the inquiry returns to whether or not the plaintiff has met her burden of persuasion. Thus, at step three, the plaintiff must prove by a preponderance of all the evidence that the reasons offered by the defendant were a pretext for discrimination. *See Sorensen,* 984 F.2d at 352; *EEOC v. Flasher Co.,* 986 F.2d 1312, 1316 (10th Cir. 1992). The presumption in plaintiff's favor that arose from the establishment of a prima facie case drops from the case. *Flasher Co.,* 986 F.2d at 1316.

When a case is fully tried, the ultimate question is whether the plaintiff proved that the defendant intentionally discriminated against her. The subsidiary steps in the *McDonnell Douglas* scheme become irrelevant. *Sorensen,* 984 F.2d at 352. The court must weigh all the evidence and assess the credibility of the witnesses to determine whether the plaintiff was the victim of intentional discrimination based upon protected class characteristics. *Flasher Co.,* 986 F.2d at 1317.

■ As the Supreme Court recently discussed, the finding of a pretextual reason does not mandate the finding of illegal discrimination. The finder of fact may disbelieve the employer's proffered reasons and still find no discrimination, because the ultimate burden of persuading the finder of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. It is not enough to

disbelieve the employer's proffered reasons; the factfinder must believe the plaintiff's explanation of intentional discrimination on the basis of a protected characteristic. *See St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Sorensen,* 984 F.2d at 349. The ultimate finding of whether there was intentional discrimination against a member of a protected class is considered a question of fact for the district court to decide. *Flasher Co.,* 986 F.2d at 1317.

■ The court shall omit the discussion of the prima facie case as it relates to the particular allegations of discrimination. The court instead turns directly to the ultimate finding of whether the agency intentionally discriminated against plaintiff on the basis of sex or age or in retaliation for prior discrimination complaints. The court finds that plaintiff failed to establish that the agency discriminated against her in any of the particulars alleged.

The agency's proffered legitimate nondiscriminatory reasons for its actions (e.g., abuse of overtime authorization, concerns about plaintiff's relationships with supervisors, coworkers, and the public) were not a pretext for discrimination. The court finds from the evidence presented and the credibility assessments it has made that the plaintiff's conduct was uncooperative and insubordinate and that plaintiff refused to follow instructions. While the agency may have engaged in an effort to remove her from her position because of dislike for her—which is an issue the court will leave to the MSPB on remand—that is not a pretext for discrimination. The agency's removal action may have been motivated by dislike for the plaintiff and may have been performed with a denial of due process, but the plaintiff failed to prove that the agency intentionally discriminated against her on the basis of any protected characteristic.

Plaintiff asserted in her post-trial brief that the defendant discriminated against her in the following particulars: (1) by soliciting comments of employees of another agency regarding the plaintiff's bathroom conduct, which comments included a discussion of when plaintiff's menstrual cycles might cease, and using that information as the basis for a charge of improper personal conduct in support of its proposal to suspend for 14 days; (2) in proposing to remove plaintiff and in removing her for reasons that were insubstantial, while internal agency documentation acknowledged that lesser discipline would be better; (3) in allowing her eventual replacement to apply for plaintiff's position when the agency knew there was no vacancy, and in provoking plaintiff into conduct which could be used against her; (4) in suspending plaintiff for five days for pretextual reasons; and (5) in proposing the transfer. The court shall briefly address each of these allegations.

The charge involving plaintiff's bathroom conduct was dropped for lack of specificity and therefore was never used to support a disciplinary action. An observation that a woman ceases menstruating at a certain age does not automatically equal age discrimination.

Plaintiff asserts that she was removed for insubstantial reasons and that lesser discipline would have been better. This particular argument seems to blend the two separate causes of action which comprise a mixed case—whether plaintiff was discharged for discriminatory reasons and whether the penalty imposed by the agency was appropriate. The latter issue is an issue relevant to the appeal of the MSPB decision. Regarding the former issue, the court finds that the reasons for plaintiff's removal were neither insubstantial nor pretextual.

Plaintiff alleges that the agency allowed her replacement to apply before the position was open and that the agency provoked her into conduct for which it could terminate her. The court cannot determine when Pfannenstiel applied for the position, so is unable to make a finding that Pfannenstiel applied before the position was open. However, the court finds no evidence that the agency solicited Pfannenstiel's application, promised her the position, or engaged in any other improper conduct in this regard. The court finds no

factual support for plaintiff's contention that the agency provoked her.

Regarding the suspension action, plaintiff has not carried her burden of persuading the trier of fact that the defendant intentionally discriminated against her on the basis of age or sex. Defendant's proffered reason for the suspension was that the plaintiff's conduct was inappropriate and interfered with the efficient operations of the office. The court found no credible evidence that this reason was a pretext for discrimination.

The proposed transfer was dropped, so plaintiff experienced no actual change in the terms and conditions of her employment as a result. Further, the court finds the agency's proffered reason—to limit plaintiff's access to the public—to be nonpretextual.

Plaintiff also argues that no other FmHA employee has ever been disciplined for staying in the office after 5:00. Plaintiff asserts that the proffered reason of working unauthorized overtime is a pretext for discrimination.

There was no evidence presented that any other FmHA employee was involved in a comparable situation but was disciplined less severely than plaintiff. There was no evidence that any other FmHA employee had abused an overtime authorization in a similar manner. There was no evidence that any FmHA employee who repeatedly and blatantly disregarded the direct orders of his or her superiors received lesser discipline than the plaintiff.

Evidence was presented that other employees were allowed some flexibility in their schedules to accommodate occasions when staying past 5:00 was required. Plaintiff has not, however, shown that any of these other employees were similarly situated. Testimony presented at trial indicated that those employees occupied positions which required travel. Flexibility was given to those employees who were required to travel great distances between various County and District offices. Plaintiff's position did not require travel.

Plaintiff complains that Thiel allowed County Office Clerk Judy Heinrich flexibility in her schedule. Heinrich worked from 9:00 to 4:00. On at least one occasion, plaintiff was responsible for Heinrich leaving the office late. Working fifteen minutes late because of a staff meeting or to finish a particular task did not cause Heinrich to remain in the office after normal office hours. Allowing Heinrich to come to work fifteen minutes late did not prevent the office from opening at 8:00. Plaintiff's position required that she be in the office at 8:00 when the office opened and to remain in the office until 5:00 when the office closed. The court finds no evidence of discrimination in treating plaintiff and Heinrich differently.

The general approach to Title VII and ADEA suits set out in *McDonnell Douglas* also applies to retaliation claims. A plaintiff must first establish a prima facie case of retaliation. If a prima facie case is established, the burden of production shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse action. If such evidence is produced, the plaintiff may prevail if she demonstrates that the articulated reason was a pretext for retaliation. *Sorensen v. City of Aurora*, 984 F.2d 349, 353 (10th Cir.1993). The trial court's determination of the motivations behind the employer's actions is a factual determination subject to the clearly erroneous standard of review. *Archuleta v. Colorado Dept. of Institutions*, 936 F.2d 483, 487 (10th Cir.1991).

Plaintiff failed to show by a preponderance of the evidence that the defendant retaliated against her for filing the previous discrimination complaint. Title VII and the ADEA prohibit discrimination based on the enumerated factors, one of which is an employee's opposition to discrimination in employment. However, Title VII and the ADEA do not "ensure that employees will always be treated fairly or that they will be discharged only for meritorious reasons." *Archuleta*, 936 F.2d at 487 (discussing Title VII).

## II. FIRST AMENDMENT CLAIM

The following standards apply to plaintiff's claim under the first amendment:

> It is now settled law that the government "may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of

speech." *Rankin v. McPherson,* 483 U.S. 378, 382, 107 S.Ct..2891, 2896, 97 L.Ed.2d 315 (1987). *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) requires courts to balance the employee's interest in speaking on matters of public concern against the government's interest, as an employer, in efficient operations. Not all employee speech implicates the First Amendment to the same degree, however. Before engaging in the *Pickering* balancing test, a court must find, as a threshold matter, that the employee's speech addresses a matter of "public concern." *Rankin v. McPherson,* 483 U.S. at 382–84, 107 S.Ct. at 2896–97; *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708; *Am. Postal Workers Union v. United States Postal Serv.,* 830 F.2d 294, 300 (D.C.Cir. 1987). For, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690.

*Barnes v. Small,* 840 F.2d 972, 982 (D.C.Cir. 1988). The court determines whether an employee's speech is protected under the *Pickering* doctrine by examining "the content, form, and context of a given statement, as revealed by the whole record." *Id.* (quoting *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690). The inquiry into the protected status of speech is a matter of law, not fact. *Id.* 840 F.2d at 982 n. 12 (quoting *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7).

■ Individual personnel disputes and grievances which would be of no relevance to the public's evaluation of the performance of the agency do not implicate the First Amendment. *Barnes v. Small,* 840 F.2d at 982–83. "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691.

■ The court finds as a matter of law that plaintiff engaged in no protected speech. For the most part, plaintiff gave others within the office the "silent treatment." To the extent that plaintiff made complaints, they were that the agency was treating her unfairly in its personnel decisions. There was no evidence that plaintiff expressed any opinions on matters of public concern. Her complaints fall into the category of individual personnel disputes which have not relevance to the public's evaluation of the performance of the agency. *See Barnes v. Small,* 840 F.2d at 982–83.

## III. THE NON–DISCRIMINATION CLAIMS

### A. Jurisdiction over Non-discrimination Claims

■ Normally, an appeal of an MSPB decision is filed in the Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703(b)(1). When the appellant makes a claim of discrimination, she has a right to de novo review of that claim in district court. 5 U.S.C. § 7703(b)(2) and (c). When the MSPB decides a case combining both discrimination and non-discrimination claims, the district court takes jurisdiction over appeals from both determinations. Rather than de novo, the district court reviews the non-discrimination claims on the record. *Barnes v. Small,* 840 F.2d 972, 978–79 (D.C.Cir.1988). A mixed case must be treated as a unit, and the district court has jurisdiction over both the discrimination and non-discrimination claims. *E.g., Christo v. MSPB,* 667 F.2d 882 (10th Cir.1981); *Doyal v. Marsh,* 777 F.2d 1526 (11th Cir.1985); *Williams v. Department of the Army,* 715 F.2d 1485 (Fed.Cir.1983).

### B. Appeal of the Five Day Suspension

Pursuant to 5 U.S.C. § 7503, an employee against whom a suspension of 14 days or less is proposed is entitled to: (1) advance written notice stating the specific reasons for the proposal; (2) a reasonable time to answer orally or in writing and to furnish documentary evidence; (3) representation by an attorney or other representative; and (4) a written decision containing the specific rea-

sons therefor. 5 U.S.C. § 7503(b). The statute does not provide for an appeal to the MSPB from a suspension of 14 days or less.

An employee against whom a suspension for more than 14 days is proposed is entitled to similar procedural protections. *See* 5 U.S.C. § 7513(b). Additionally, an employee against whom a suspension for more than 14 days is taken is entitled to appeal to the MSPB pursuant to 5 U.S.C. § 7701. *See* 5 U.S.C. § 7513(d).

The jurisdiction of the MSPB is not plenary, but is limited to those actions which are made appealable to it by law, rule, or regulation. The applicable statute provides for MSPB review of a suspension of more than 14 days. *Synan v. Merit Systems Protection Board,* 765 F.2d 1099, 1100 (Fed.Cir.1985). The statute disallows appeals to the MSPB concerning suspensions of 14 days or less. *See Meglio v. Merit Systems Protection Board,* 758 F.2d 1576, 1578 (Fed.Cir.1984).

■ Jurisdiction exists in the district court over cases in which an employee has been affected by an action of an agency which may be appealed to the MSPB, and the employee alleges that the basis for the agency's action was discrimination prohibited by, e.g., the Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964. 5 U.S.C. §§ 7702–7703. If the agency action is appealable to the MSPB, and the MSPB finds no discrimination, the action is appealable to the district court. If the adverse agency action is not appealable to the MSPB, there is no basis for jurisdiction in the district court. *Wall v. United States,* 871 F.2d 1540, 1542–43 (10th Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990).

■ Since a five day suspension in not appealable to the MSPB, there is no jurisdictional basis for this court to review the suspension decision or the cancellation of her grievance. The plaintiff has pointed to no statute or regulation which would provide this court with jurisdiction to review the agency's cancellation of her grievance.

## C. Appeal of the Termination Decision

The standard of review for a decision of the MSPB on a non-discrimination claim is as follows:

... A MSPB decision must be upheld unless the reviewing court determines that it is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) obtained without procedures required by law, rule, or regulation having been followed; or

(3) unsupported by substantial evidence.

5 U.S.C. § 7703(c).

*Williams v. Rice,* 983 F.2d 177, 180 (10th Cir.1993).

■ The court may not substitute its judgment for that of the MSPB. *Id.; Wilder v. Prokop,* 846 F.2d 613, 619 (10th Cir.1988). The court can only insure that federal law and required procedures have been followed and that the MSPB's action is not arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. *Wilder v. Prokop,* 846 F.2d 613, 619 (10th Cir.1988). "Under the arbitrary and capricious standard the MSPB's decision needs only to have a rational basis in law." *Id.* at 620; *see Williams v. Rice,* 983 F.2d at 180.

Under the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard of review, the decision of the MSPB is given the same presumption of validity granted to any administrative adjudication. *Wilder v. Prokop,* 846 F.2d 613, 619 (10th Cir.1988). The court's review focuses on whether the MSPB "acted within the scope of its authority; followed the necessary procedural requirements; and made a decision that was not arbitrary, capricious, an abuse of discretion, in which the relevant factors were considered and there was no clear error of judgment." *Id.* In the present case, there is no dispute that the MSPB was acting within the scope of its authority in reviewing plaintiff's removal.

The court will affirm a decision of the MSPB sustaining the dismissal of a federal employee if the "decision complies with the applicable statute and regulations and [if] it

has a rational basis supported by substantial evidence from the record taken as a whole." *Martin v. Federal Aviation Administration*, 795 F.2d 995, 997 (Fed.Cir.1986) (quoting *Hayes v. Department of the Navy*, 727 F.2d 1535, 1537 (Fed.Cir.1984)). If an error is procedural in nature, the plaintiff is required to demonstrate that the asserted procedural error was harmful. *Id.*

■ Under 5 U.S.C. § 7701(c)(2)(A), the MSPB will not sustain the agency's decision if the employee shows harmful error in the application of the agency's procedures in arriving at the decision. The term "harmful error" means: "Error by the agency in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error. The burden is on the appellant to show that the error was harmful, i.e., that it caused substantial harm or prejudice to his or her rights." 5 C.F.R. 1201.56(c)(3); *Mercer v. Department of Health & Human Services*, 772 F.2d 856, 859 (Fed.Cir.1985). When a removal action is based upon substantial evidence and conforms with the law, a deviation from specified procedure does not automatically invalidate a discharge. *Boylan v. United States Postal Service*, 704 F.2d 573, 577 (11th Cir.1983), *cert. denied*, 466 U.S. 939, 104 S.Ct. 1916, 80 L.Ed.2d 464 (1984).

■ Plaintiff claims a due process violation in the fact that the agency failed to make all relevant evidence available to her during the administrative process. From the matters presented at trial, it is clear that certain agency documentation had been withheld from the administrative process. It is unclear to the court whether this omission was inadvertent or intentional. The documents in question were made available to the plaintiff and her counsel only shortly before the start of trial in this case.

The withheld evidence was furnished by the Assistant United States Attorney in response to the discovery orders of this court. The United States Attorney's Office was not involved in the MSPB proceedings and appears to have no responsibility for the lack of disclosure during the MSPB process. The exhibits made available shortly before trial appear to include at least the following: Plaintiff's Exhibits 21, 22, 23, 24, 25, and 80.

A key document was Plaintiff's Exhibit 80, a letter dated September 21, 1986, from Supervisory Personnel Management Specialist Marilyn Dickman to State Director Larry Davis. This seven page letter is extremely critical of plaintiff's two immediate supervisors, County Office Supervisor Bandel and District Director Smith. Dickman stated that plaintiff "was working under a very weak administrative supervisor." Bandel never counseled plaintiff that her job performance and conduct were unacceptable. Plaintiff's most recent performance appraisal was satisfactory.

Dickman's letter discussed Bandel's lack of understanding of the technical requirements of the job and inefficiency in processing loans. Dickman stated that it was impossible to determine from the files whether loan processing was delayed due to the actions or inactions of plaintiff or Bandel. Dickman stated that either scenario was just as likely, but it appeared that the agency was attempting to make plaintiff solely responsible. Bandel's entries in the running record ranged from vague and general instructions to detailed step-by-step instructions on what plaintiff was to do. Dickman asked, "Is it unreasonable for Ms. Mitchell to allege that she had no way of knowing exactly what was necessary in a particular instance when the rules of the game seemed to change constantly?"

Dickman's letter indicates that State Director Davis was considering a proposal to remove plaintiff in the absence of any prior disciplinary action. Dickman pointed out several problems with such a proposal: plaintiff was never formally counseled about her deficiencies; the agency failed to initiate less severe action against plaintiff before the problems reached this point; Bandel may have caused most of the problems and he was blaming plaintiff; no disciplinary action was ever taken against Bandel, who was responsible for the office; and the District Director failed to recognize the problems with the office, but no disciplinary action had been taken against him for failure to handle the

situation. Dickman recommended that disciplinary action be taken against both Bandel and Smith.

The agency appears to have engaged in an effort to build a case against the plaintiff, but it failed to disclose all relevant evidence for the administrative review process. Lurking in the record is what appears to be an undisclosed reason for plaintiff's termination—a dislike of the plaintiff, stemming perhaps from her unpleasant demeanor,. which led to what appears to be a concerted effort to remove her. Plaintiff was blamed for all the problems experienced in the Ness City office, many of which may be attributed to mismanagement by the County Office Supervisor and District Director. Plaintiff was blamed for poor quality of work and poor relations with the public, while her supervisors were never disciplined for allowing these things to occur.

Plaintiff submitted discovery requests to the agency pursuant to the discovery rules contained in 5 C.F.R. § 1201.71 et seq. Plaintiff's Exh. 87. The discovery requests were very broad, seeking any information regarding the plaintiff. Further, the Administrative Judge ordered the agency to provide copies of all documents which are relevant and material to the appeal. MSPB Record, Vol. I, at 38.

The court finds that the agency violated plaintiff's due process rights when it failed to disclose all relevant evidence during the administrative process. The court further finds that the error was harmful. Had all the documentation been before the MSPB, it might have made a different decision. The agency's failure to disclose all relevant evidence prevented the plaintiff from fully and fairly exercising her rights under the review process.

Administrative Officer Leann Decker testified at trial regarding the steps a supervisor should take before an employee is to be terminated for conduct problems. The supervisor should inform the employee that the conduct is unacceptable, document the conduct, and seek the input of the district director, state director and personnel office.

The agency should then use a progressive chain of discipline, beginning with verbal warnings, then progressing to written reprimands, warning letters, suspensions from 1 to 14 days (proposed by the state office), and suspensions up to 30 days (proposed by national office).

Exhibits admitted at trial indicate that FmHA failed to follow this policy of progressive discipline. Petree of the St. Louis office recommended giving plaintiff a letter of warning. Plaintiff's Exh. 82. Decker testified that plaintiff never received any warning letters, only verbal warnings. Notes from Petree about the agency's plan to propose plaintiff's removal contain the suggestion that the agency should take less severe disciplinary action, such as reprimands or suspensions. Proposing removal shows an agency predisposition to take stronger disciplinary action than appropriate. Plaintiff's Exh. 22. This suggestion by Petree was not followed by the state office.

In a letter from Petree to Decker dated February 3, 1988, Petree noted that the agency must be able to establish a rational connection between dismissal of an employee, as opposed to some lesser discipline, and the statutory standard of promoting the efficiency of the service. Petree again recommended proceeding with a suspension action (14 days or less) rather than removal. Petree indicated that demonstrating restraint would help show that the agency did everything within reason to coax the employee into changing her behavior prior to termination. Plaintiff's Exh. 23. The agency again chose not to follow Petree's advice.

The testimony at trial and the previously undisclosed exhibits gave the court the distinct impression that the agency had a policy of using progressive discipline and that termination was to be very sparingly imposed. On remand (see below), the MSPB shall reconsider the so-called *Douglas*[2] factors, paying specific attention to the final factor, the adequacy and effectiveness of alternate sanctions to deter future conduct by the employee or others, in light of apparent agency policy.

**2.** *Douglas v. Veterans Admin.,* 5 M.S.P.R. 280 (1981).

D. Scope of Relief

"If the district court finds that an MSPB action ... is arbitrary and capricious, it should then remand the case to the MSPB. A remand rather than a court consideration of the merits of appellant's case is the general procedure, absent special circumstances or questions of law which are determinative of the appellant's claims." *Wilder v. Prokop,* 846 F.2d 613, 620 (10th Cir.1988). *See Shubinsky v. United States,* 203 Ct.Cl. 199, 488 F.2d 1003, 1007 (Ct.Cl.1973) (remand to the Civil Service Commission to consider merits of claim is "most expeditious and appropriate"); *Casey v. Merit Systems Protection Board,* 748 F.2d 685, 687 (Fed.Cir.1984) (vacating and remanding for further proceedings); *Strickland v. Merit Systems Protection Board,* 748 F.2d 681, 684 (Fed.Cir.1984) (in usual case, remand to the MSPB is appropriate).

Accordingly, the court shall reverse the decision of the MSPB and remand to MSPB with instructions to conduct further proceedings to allow the Board to consider all documentation not previously disclosed by the agency. All relevant agency documentation, including those documents which were not presented during the prior proceedings, shall be presented to the MSPB on remand. Further, the MSPB shall reconsider the *Douglas* factors, including the adequacy and effectiveness of alternate sanctions, given the agency's apparent policy of terminating an employee only as a last resort. Given this resolution, the court does not address plaintiff's other challenges to the decision of the MSPB.

**IT IS BY THE COURT THEREFORE ORDERED** that the decision of the Merit Systems Protection Board is reversed and the action is remanded for further proceedings consistent with this memorandum and order.

**IT IS FURTHER ORDERED** that judgment be entered in favor of the defendant on all other claims for relief.

No costs shall be assessed.